Filed 10/24/13  P. v. Castaneda CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G046788 |
| v. | (Super. Ct. No. 09CF0473) |
| AARON ERNESTO CASTANEDA and JASON ANTHONY LUNA, | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Thomas M. Goethals, Judge.  Affirmed as modified.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant Aaron Ernesto Castaneda.

Allison H. Ting, under appointment by the Court of Appeal, for Defendant and Appellant Jason Anthony Luna.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Andrew Mestman and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

Appellants Aaron Ernesto Castaneda and Jason Anthony Luna were jointly tried for murdering Julio Zavala for the benefit of a criminal street gang. The jury convicted Castaneda as charged and found Luna guilty of street terrorism. On appeal, Castaneda argues his attorney was ineffective and his sentence is flawed. He also claims, as does Luna, that the gang findings must be reversed due to insufficient evidence and instructional error. Other than to make some minor modifications to Castaneda's sentence, we affirm the judgment in all respects.

FACTS

This case arises out of a shooting that occurred near Santa Ana's Main Place mall in 2009. At that time, Castaneda, aka Oso, and Luna were members of a criminal street gang called the Santa Ana Stoners (SAS). Christian Medina was also in SAS. In fact, he was at the center of the storm on the day of the shooting.

Medina lived in the same building as Brenda Mendoza, and both of them attended a small continuation high school located just off Main Street in Santa Ana. On February 20, 2009, at about 11:00 a.m., they were outside for gym class when Zavala, a former student at the school, came up to Mendoza and started talking with her. Seeing this, Medina confronted Zavala, asking him where he was from. Medina claimed SAS and began making various hands signs. The two exchanged heated words, but nothing further transpired between them at that time. When gym class ended, Medina and Mendoza went back to school, and Zavala went about his way.

A short while later, around 12:15 p.m., school ended for the day. While Mendoza was waiting for her mother to pick her up, she noticed a group of students gathered across the street from the school. She went over to see what was going on and discovered Medina and Zavala were again engaged in a verbal confrontation. Mendoza tried to get them to stop, as did her mother when she arrived at the scene, but they continued arguing for several minutes.

2

While they were going at it, Zavala had his hand underneath his shirt. Mendoza did not see a weapon, but she suspected he may have had one based on the way his hand was positioned. Mendoza heard Zavala say something to the effect that Medina had disrespected him in front of his family. At one point, Mendoza saw Medina talking on his cell phone. Mendoza didn't know who he was talking to, but he heard him say, "Hey, you need to come down. . . . Something is going to go down. You need to come pick me up."

Eventually, Medina and Zavala went their separate ways. As Medina was walking away, Mendoza's mother asked him if he wanted a ride home. He declined, saying his "homies" were going to pick him up. Then he headed toward Main Street. As he made his way, he was looking down at his phone and appeared to be texting.

By this time, Medina's teacher Christian Butala had heard that something was going on. When he went outside, he noticed Zavala driving off in a white Cadillac.[1] Butala got in his car, drove around the corner and saw Medina walking toward Main Street with a large man who was wearing a white T-shirt. Butala pulled up to them and asked Medina if he was alright. Before Medina could answer, his companion chimed in and told Butala, "Yes, that's why I'm here. Go ahead and get out of here." Butala did as told and drove back to the school.

A few minutes later, Christina Ruiz was exiting the Main Place mall onto Memory Lane when she heard a loud noise that caught her attention. Looking about, she saw a large man wearing a white T-shirt and dark shorts standing in the street in front of her. The man was shooting a gun at close range into the driver's side of a white Cadillac. After firing four or five shots in quick succession, the man walked over and entered the passenger side of a black Jeep Cherokee that was waiting for him in the area. There were

---

[1]     Butala had seen Zavala earlier that morning at the school. At about 9:00 a.m., Zavala came to his classroom and asked him about college courses. The encounter was brief, and Butala did not see Zavala again until after school that day.

3

two or three other people in the Jeep, and once the shooter got in, the vehicle took off toward Broadway.

The target of the fatal attack was Zavala. The driver of the Cadillac, he took multiple shots to the body and was immediately incapacitated. His car then careened over a curb, crashed into a planter and caught fire. At that point, Ernesto Almazon exited the passenger seat of the vehicle and took off running. He and Zavala were both believed to have ties to the Sick Heads gang, which is a rival of SAS. Inside Zavala's vehicle the police found graffiti and a baseball bat. An embedded bullet was also recovered from the driver's side headrest.

Moments after the shooting, Fernando Robles was driving in the area when he saw a black Jeep Cherokee darting in and out of traffic in an erratic fashion. The Jeep's driver, a thin Hispanic, looked about 15 years old and was wearing a dark T-shirt and a baseball cap. Next to him in the passenger seat was a heavy-set Hispanic male who was wearing a white T-shirt.

Later that afternoon, Medina spoke with Mendoza at their residence. He told her, "Oh, your little homey's dead. We killed your little friend." When Mendoza asked him what he was talking about, he said, "Yeah. He's dead." Medina then went to his computer and pulled up an online article about the shooting. He bragged to Mendoza about killing Zavala and made it clear that was their intention.[2]

Meanwhile, the police had tracked the black Jeep Cherokee to Cypress Avenue in Santa Ana. At about 3:00 p.m., undercover officers saw Oneida Orenday pull up to 222 South Cypress in the vehicle. She then continued driving to an auto body shop in Garden Grove, where Castaneda had arranged for the Jeep to be painted.[3] When

---

[2]     Medina was interviewed by the police on the night of the shooting, but he was not arrested at that time. Following his release, he fled the area and his whereabouts became unknown. At that time, he was about five and a half feet tall and weighed 130-140 pounds.

[3]     Phone records indicate Castaneda called the shop at 2:32 p.m. that day, roughly two hours after the shooting.

Oneida arrived at the shop, she gave the keys to the Jeep to the owner. She then entered a van and drove to the California Lodge Motel in Santa Ana.

Upon arriving at the motel, Orenday entered room 910, where Castaneda was holed up. The police staked out the room until the gang unit arrived. Then they knocked on the door and demanded entry. At that point, Castaneda surreptitiously dropped a loaded pistol magazine out a window. Castaneda also tried to resist arrest when the police entered the room. However, even though he was six feet tall and weighed between 250 and 350 pounds, the officers were able to take him into custody.

Inside the room, the police found a baggie with several bullets in it. Those bullets were not linked to the shooting, but the pistol magazine Castaneda dropped out the window was compatible with the bullet casings that were found following the shooting.[4] Although investigators could not tell if the magazine was used in the shooting, they were able to determine all of the casings were fired from the same gun. The actual murder weapon, however, was never recovered.

As part of their investigation, the police showed the witnesses photographic lineups that contained pictures of the suspects. Mendoza recognized Castaneda as having come to her residence to pick up Medina on an occasion prior to the shooting. Butala and Ruiz were unable to identify Castaneda. And Robles initially identified Medina as the driver of the Jeep, but later identified Luna as the wheelman.

Six days after the shooting, the police executed a search warrant at Castaneda's residence in Santa Ana, where he lived with his family. In Castaneda's bedroom and a den in the garage, officers found various forms of graffiti associated with SAS. They also found a shotgun shell, a gun cleaning kit and a large white T-shirt and a pair of dark shorts that were consistent with those worn by the shooter.

---

[4] Four casings were found at the scene of the shooting, and another was found in the black Jeep Cherokee Ordenay dropped off to be painted.

5

Six months later, on August 27, 2009, the police stopped Luna in Santa Ana for speeding. During the stop, Luna was in possession of a graffiti marker, and the police found a blue baseball cap in his vehicle. The cap had "SAS" printed on the front and the word "Stoners" on the back. When questioned at the scene, Luna initially denied being in SAS, but he eventually admitted he was. He also admitted he was on probation for vandalism. At that time, he was about five-foot five, 140 pounds.

Luna was taken to the Santa Ana police station for further questioning. At first, he denied both gang membership and ownership of the baseball cap. But, as the interview progressed, he conceded he "kicked it" with SAS and had the cap custom made. When asked about his cell phone, he said he shared it with other members of his family. And when asked about various photos on his phone that depicted SAS graffiti and guns, he said he wasn't there when the pictures were taken. Luna did admit there was a photo of Medina on the phone, but he insisted he had never called or texted him. He also denied knowing Castaneda or having anything to do with the shooting.

Despite Luna's claims, phone records showed he and Medina exchanged numerous text messages on the morning of the shooting. Medina told Luna some "shit heads," a derogatory term for members of the Sick Heads gang, were giving him a hard time at school and wanted to kill him. He also said the Sick Heads were going to come looking for him after school and "fuck [him] up" because he was "putting in [his] work," i.e., committing crimes for SAS. In response, Luna told Medina he was going to "go packing."[5]

---

[5] These are the pertinent texts:
10:44 a.m. [Medina]: "A wats up mija?"
11:37 a.m. [Luna]: "Wats up foo wat u doing?"
11:43 a.m. [Medina]: "Nada in skool. Wheres Johnny?"
11:44 a.m. [Luna]: "Fuck that foos sleeping still."
11:52 a.m. [Medina]: "A tell him to pick me up. A couple of Shit Heads came to my skool. They wanna kill me."
11:54 a.m. [Luna]: "WTF? Yea. Y? Wat they say?"
11:58 a.m. [Medina]: "Foo, they came into the skool looking 4 me then started saying they were gonna fuck me up and"

There were also several phone calls between Luna and Castaneda on the morning of the shooting. In fact, they spoke four times within 30 minutes of the shooting.

Detective Matthew McLeod of Santa Ana Police Department was the lead investigator on the case. He also testified as a gang expert for the prosecution at trial. McLeod said gang members thrive on respect and obtain it by committing violent crimes. This is known as "putting in work" for the gang. Given the importance of respect in the gang community, gang members are expected to retaliate harshly when they are challenged. They are also expected to back each other up when engaging in criminal activity. Guns are important to gangs because of their obvious connection to violence. Amongst gang members, they are often talked about for tactical reasons in terms of carrying out the gang's criminal objectives.

Describing the "evolution" of SAS, McLeod said it started out as a tagging crew in the early 2000's and was originally involved in graffiti and vandalism. Then around 2006-2007, it "cliqued up" with two other tagging crews and its members began committing more serious crimes. McLeod opined that by the time this case arose in 2009, SAS was a full-fledged criminal street gang because its primary activities were

---

11:59 a.m. [Luna]: "Fuck shit heads iam gana go packing fuck it homie."
12:03 a.m. [Medina]: "Yeah i think they gonna come after skool. There mad cuz im putting in my work. Hahaha lets."
12:19 a.m. [Luna]: "Fuck ya foo it's the pan at ur skool or wat?"
12:25 a.m. [Medina]: A foo I can't answer the phone . . . but erase the messages foo serious."
12:25 a.m. [Luna]: "Oh shit fucked him up whos car??"
12:36 a.m. [Medina]: "Idk some one that works there."
12:37 a.m. [Luna]: "Haha . . . fuck it or wat nd that gurl seen the car."
12:53 a.m. [Medina]: "Wat girl? Foo osos lady knows whos it is but they dnt care. They just want some arts . . . ."
1:15 p.m. [Medina]: "A foo wat time u gonna come out of skool? Ru gonna pick me up on time?"
1:29 p.m. [Luna]: "Like a lil bit nd iam gana try foo nd now the tahoe is fucking leaking again."
1:30 p.m. [Medina]: "Mmmm a foo try to come as soon as u get out cuz they gonna let us out early."

The times shown are those set forth in Medina and Luna's phone records. Although there was conflicting evidence on the issue, we presume the records reflect Pacific Standard Time.

7

unlawful taking of vehicles and illegal firearms possession. McLeod estimated SAS had between 13 and 20 members at that time.

Based on his knowledge of SAS, McLeod testified that between 2007 and 2009, SAS members committed two unlawful vehicle takings. When asked if that was a conservative estimate, McLeod said yes. He was then asked about SAS' involvement in illegal firearms possession during that period. Specifically, he was asked what he knew "in terms of the number of investigations involving SAS members and that type of crime." McLeod replied, "I know of right now off the top of my head at least three."

McLeod then testified about specific instances of criminal activity by SAS members, so-called predicate offenses. He said that in 2008, SAS member Marcos Moya unlawfully possessed a firearm and committed street terrorism. In that case, Moya also admitted acting for the benefit of a criminal street gang. In another case arising in 2008, SAS member Oscar DeRobles pleaded guilty to unlawfully taking a vehicle within the meaning of Vehicle Code section 10851. McLeod said he was aware of one other case in which an SAS member, identified only as "Mr. Vergara," was convicted of that offense.

Speaking of the people involved in this case, McLeod opined that Castaneda, Luna and Medina were all members of SAS at the time of the shooting. He also estimated that while Castaneda weighed about 250-275 pounds when he was arrested, he was lighter and had longer hair at the time of trial. It was also McLeod's opinion that the facts of this case mirrored the "typical gang scenario" in which one gang member is involved in a dispute with a rival and then seeks backup from other members of his gang. McLeod believed the Zavala shooting would benefit SAS by eliminating one of its enemies and enhancing its reputation for ruthlessness.

The defense case consisted of two witnesses. Robert Murphy testified he saw the shooting from the second story of an office building in the area. He described the shooter as a husky six-footer with short hair who was wearing a white T-shirt and dark

8

shorts or pants. He also said he saw a man (Almazon) flee from the passenger side of Zavala's car after it crashed and caught fire.

Sheriff's Deputy Howard Chang testified he witnessed the shooting while driving in the area but didn't stop because he was off duty and too busy running errands. He said the shooter came from the driver's side of the Jeep and was a heavy set Hispanic male, wearing checkered shorts, and between five-foot eight and five-foot ten inches tall.

The jury also heard testimony from Luna's sister Stephanie. Called to the stand by Castaneda's attorney, she testified Edgar Farias was a family friend who was "six foot plus" and weighed between 220-250 pounds at the time of the shooting. This contradicted McLeod's testimony, who described Farias as an SAS member who was five-foot eight or nine and weighed 160-170 pounds. But Castaneda successfully moved to have Stephanie's testimony stricken when he found out the prosecution intended to impeach her with evidence she was involved in a pro-SAS tagging incident that occurred after the shooting, so the testimonial conflict disappeared.

In discussing the jury instructions with counsel, the court stated it intended to instruct on the lesser included offense of voluntary manslaughter under the theories of imperfect self-defense and heat of passion. The court believed those theories were plausible because Medina's text messages to Luna before the shooting indicated he feared the Sick Heads were going to kill him after school that day. The parties all agreed and expressly consented to the court instructing on voluntary manslaughter.

In closing argument, Castaneda's attorney conceded Castaneda was the shooter. However, he asserted Zavala and his companion Almazon were the aggressors in that they actively pursued Medina on the day of the shooting. Counsel surmised that, not only did Zavala have a baseball bat in his car, but Almazon may have been armed, which would explain why he fled the scene after the shooting. Consistent with Mendoza's testimony, counsel also argued Zavala may have had a gun under his shirt when he and Medina argued after school. While conceding Castaneda was the gunman,

9

counsel posited Castaneda was only guilty of voluntary manslaughter because he honestly believed he needed to use deadly force to protect himself and/or Medina. Counsel also submitted the heat-of-passion theory of voluntary manslaughter could apply because the shooting "happened in a moment and was over in a moment."

The jury didn't buy either theory. It convicted Castaneda as charged of first degree special circumstances murder and active participation in a criminal street gang, aka street terrorism. It also found true allegations that Castaneda was a member of and acted for the benefit of a criminal street gang and that he personally used a firearm to cause Zavala's death. The jury acquitted Luna of murder but found him guilty of street terrorism. He was sentenced to two years in prison, and Castaneda got life without parole, plus 25 years to life.

I

Castaneda argues his attorney was ineffective for conceding he was the shooter and arguing in favor of voluntary manslaughter. We do not believe that to be the case.

""""In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citations.]"""" (*People v. Lucas* (1995) 12 Cal.4th 415, 436.) "Because of the difficulties inherent in making [this] evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" (*Strickland v. Washington* (1984) 466 U.S. 668, 689.) "[C]ounsel has wide latitude in deciding how to best represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." (*Yarborough v. Gentry* (2003) 540 U.S. 1, 5-6.)

To prevail on an ineffective assistance of counsel claim, the defendant must also affirmatively establish prejudice. (*Strickland v. Washington, supra*, 466 U.S. at p. 687.) To do this, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id*. at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid*.) Under this standard, the defendant "must carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." (*People v. Williams* (1988) 44 Cal.3d 883, 937.)

Castaneda admits that, in order to maintain credibility with the jury, conceding an issue or fact in closing argument may be a reasonable defense tactic in some situations. However, he argues the evidence implicating him as the shooter was so weak, there was no rational basis for his attorney to concede the issue of identification and pursue a manslaughter verdict. A better defense strategy, he submits, would have been to contest the prosecution's theory he was the gunman and argue he only aided the perpetrators *after* the shooting.

It's always easy to second-guess trial tactics after a loss. But as the trial court told Castaneda at the time of sentencing, the evidence strongly indicated he was the shooter. It's true, as Castaneda points out, that none of the witnesses were able to identify him as the shooter. However, their testimony painted a picture of the shooter that strongly resembled Castaneda in one key dimension, physical size. Teacher Butala testified the person he saw walking with Medina after school was a "larger" male, about five-foot ten and 220-240 pounds. Prosecution witness Ruiz described the shooter as five-foot ten or eleven, having a "larger build" and weighing 200-250 pounds. Defense witnesses Murphy and Chang said the shooter was about six-foot tall, "husky," and "heavy, heavy set." And Robles, who saw the Jeep minutes after the shooting, described the passenger as a "heavier set" Hispanic male.

11

Castaneda argues these size estimates were not very incriminating because the evidence showed he weighed 350 pounds at the time of the shooting. Indeed, Santa Ana Police Officer Tyler Salo estimated Castaneda weighed about that much at the time he was taken into custody on the night of the shooting. However, lead investigator McLeod disagreed with that estimation. In his view, Castaneda weighed closer to 250-275 pounds when he was arrested. The point is, Castaneda was a large man, which is how all of the witnesses described the shooter.

The witnesses also described the shooter by his clothing. The most common description was of a person wearing a white T-shirt and dark shorts, which is precisely what the police found in Castaneda's house following the shooting. While these clothing items are not particularly distinctive, their discovery does support the prosecution's theory that after the shooting, Castaneda went home and changed before holing up at the California Lodge Motel. In that regard, it's worth noting that when Castaneda's shorts were shown to Ruiz at trial, she said that, in terms of style and color, they looked like the ones the shooter was wearing.

Castaneda's membership in SAS is another factor connecting him to the shooting. According to McLeod, SAS only had about 13-20 members at the time of the shooting. And besides Castaneda, none of its members were described as coming anywhere close to the description of the shooter. Castaneda was not only a distinctive member of the gang that was believed to have murdered Zavala, the evidence also linked him to Luna and Medina, who were key figures in the events leading up to the shooting. Mendoza testified she had seen Castaneda come to her residence to pick up Medina in the past. And phone records showed Castaneda and Luna spoke several times on the morning of the shooting. Castaneda was also referenced by his gang moniker Oso in the texts between Luna and Medina. Based on all of this evidence, it is reasonable to presume Castaneda knew Medina was in need of backup after school that day.

12

Then there is the post-shooting evidence. About two hours after the shooting, Castaneda called an auto body shop in Garden Grove and requested a paint job for a Jeep. A short time later, Ordenay arrived at the shop in the shooter's black Jeep Cherokee. She then went to a motel room where Castaneda was hiding out. When the police entered the room, Castaneda discarded a loaded pistol magazine that was compatible with the murder weapon and forcibly resisted arrest. Officers also found additional ammunition in the room.

Considering the identification evidence in conjunction with all of the other evidence in the case, it is highly unlikely the jury would not have found Castaneda to be the shooter. Therefore, it was reasonable for Castaneda's attorney to pursue strategies that involved reduced culpability, such as voluntary manslaughter, as opposed to outright acquittal.

When the trial court broached the subject of voluntary manslaughter with the parties, all sides agreed with the court it was a viable theory that enjoyed substantial evidentiary support. Thus, the trial court instructed the jury a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone in imperfect self-defense or the heat of passion. Imperfect self-defense applies if the defendant acted with an honest but unreasonable belief in the need to protect himself or others, and heat of passion applies if, as a result of provocation, the defendant acted rashly and under the influence of intense emotion that obscured his judgment. (CALCRIM Nos. 570, 571.)

As to whether those theories applied to Castaneda, the record shows his fellow gang member Medina was being threatened by rival gang members on the morning of the shooting. Medina texted Luna the rivals wanted to kill him and were going to come looking for him after school. Medina didn't mention Zavala by name, but after school, he and Zavala revived their argument from earlier that day. At that time,

13

Zavala was upset Medina had disrespected him, and he appeared to be armed. Castaneda came to the school to protect Medina, and a short time later, the shooting occurred.

It's unclear how the black Jeep Cherokee and Zavala's vehicle met up near the mall prior to the shooting. But if they met by happenstance or Zavala tracked down the Jeep, Castaneda may have honestely believed he and his fellow occupants were in imminent danger of being attacked by Zavala and/or his passenger. On the other hand, if the Jeep tracked down Zavala's car, Castaneda may have been so riled up about what had recently happened to his gang pal Medina that his judgment was obscured by the heat of passion at the time of the shooting. Either way, voluntary manslaughter was a viable theory for Castaneda's attorney to pursue, particularly in light of the strong evidence implicating Castaneda as the shooter.

Therefore, we do not believe Castaneda's attorney was ineffective for conceding Castaneda was the shooter and urging the jury to convict him of voluntary manslaughter instead of murder. We presume that had he *not done so*, and the same verdict followed, Castaneda would now be faulting him for *failing to argue* voluntary manslaughter as a lesser offense to murder. This "damned if you do, damned if you don't" dilemma is precisely why the standard of review of defense counsel tactics is highly deferential. We simply cannot say that defense counsel's strategy was so lacking as to fall outside the bounds of reasonably competent representation or that Castaneda would have obtained a more favorable result had his attorney argued the case any differently. Therefore, we find no violation of Castaneda's right to effective assistance of counsel.

## II

Appellants also claim the jury's findings on the gang charges must be reversed due to insufficient evidence and instructional error.[6] We disagree.

---

[6] With respect to this claim, appellants have joined each other's arguments to the extent they are applicable.

14

The standard of review in assessing the sufficiency of the evidence to support a criminal conviction is "highly deferential." (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.) Our task is to "'"examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence[.]"'" (*People v. Alexander* (2010) 49 Cal.4th 846, 917.) "Although we must ensure the evidence is reasonable, credible, and of solid value," we must keep in mind "it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.) Reversal is warranted only if "'upon no hypothesis whatever is there sufficient substantial evidence to support'" the judgment. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) The same standard applies in reviewing the sufficiency of the evidence to support a sentence enhancement or a special circumstances allegation. (*People v. Mayfield* (1997) 14 Cal.4th 668, 790-791; *People v. Augborne* (2002) 104 Cal.App.4th 362, 371.)

In addition to convicting Castaneda of first degree murder, the jury found him and Luna guilty of street terrorism in violation of Penal Code section 186.22, subdivision (a).[7] That provision states, "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished" up to three years in prison. (§ 186.22, subd. (a).)

The jury also found true three gang-related allegations attendant to the murder charge. First, the jury found true the special circumstances allegation Castaneda murdered Zavala while he was an "active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the

7       All further statutory references are to the Penal Code.

15

activities of the criminal street gang." (§ 190.2, subd. (a)(22).) Second, the jury found true the enhancement allegation that Castaneda murdered Zavala "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further or assist in any criminal conduct by gang members[.]" (§ 186.22, subd. (b).) And lastly, the jury found true that, in acting with such intent, Castaneda intentionally discharged a firearm and thereby proximately caused Zavala's death. (§ 12022.53, subd. (d), (e).)

The substantive gang count and the gang allegations required the prosecution to prove SAS was a criminal street gang at the time of the murder. A criminal street gang is "an ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).)

Focusing on the primary activities requirement, appellants assert the prosecution failed to present substantial evidence SAS has as one of its primary activities the commission of one or more of the offenses enumerated in section 186.22, subdivision (e). Among the offenses listed in that subdivision are murder and the unlawful taking of a vehicle (§ 186.22, subd. (e)(3) & (25)), as well as four offenses involving illegal possession of a firearm: Possessing a concealable firearm (§ 12101), possessing a firearm by a felon or drug addict (§ 12021), carrying a concealed firearm (§ 12025), and carrying a loaded firearm (§ 12031). (§ 186.22, subd. (e)(23), (31), (32) & (33).)

As interpreted by our Supreme Court, the term primary activities requires more than the occasional commission of the statutorily enumerated offenses; rather, the prosecution must prove the commission of such crimes "is one of the group's 'chief' or 'principal' occupations. [Citation.]" (*People v. Sengpadychith* (2001) 26 Cal.4th 316,

16

323.)  This requirement may be proven by direct evidence of past or present criminal acts or through an expert witness who has knowledge of the gang's activities.  (*Id*. at pp. 323-324, citing *People v. Gardeley* (1996) 14 Cal.4th 605.)

Gang expert McLeod testified that as a gang detective in the Santa Ana Police Department he has investigated gang-related cases for about 10 years.  He has been the lead investigator in about 70-80 gang homicides and testified as an expert on criminal street gangs in 40-50 cases.  His testimony made clear the Santa Ana Police Department keeps extensive records on gangs and gang members.  Those records include information obtained during field interviews and other contacts.  Besides assessing and researching that information in preparation of his testimony, McLeod said he is familiar with SAS because he has spoken to its members, investigated its crimes and talked to its victims.

Notwithstanding McLeod's extensive experience with gangs, appellants contend his testimony about SAS's primary activities was insufficient for a number of reasons.  First, they contend McLeod premised his opinion about SAS based on a faulty understanding of the primary activities requirement.  The record supports this contention, as made clear by this exchange:

"Q.  [Prosecutor]:  Have you heard the term 'primary activities'?

"A.  [McLeod]:  Yes.

"Q.  Is that part of the legal definition [of a criminal street gang] according to your training?

"A.  Yes.

"Q.  How does it apply in the context of gang culture?

"A.  . . . [T]he primary activities are the criminal activities or criminal endeavors in which the members of a certain group or gang will find themselves or partake in order to further or benefit the group.

17

"Q. So it's basically the primary crimes that a particular gang commits. Is that fair to say?

"A. Yes.

"Q. What are the primary activities of SAS?

"[¶] . . . [¶]

"A. As of [the] date [of Zavala's murder] I would have to characterize them as . . . operating a vehicle without the owner's consent, as well as illegal firearms possession."

As set forth above, the primary activities requirement has two prerequisites. Not only must the prosecution prove the group in question has committed certain statutorily enumerated crimes, it must also demonstrate that, compared to everything else it does, the commission of those crimes "is one of the group's 'chief' or 'principal' occupations. [Citation.]" (*People v. Sengpadychith, supra,* 26 Cal.4th at p. 323.) However, McLeod did not offer his opinion about SAS' primary activities by comparing its criminal endeavors to its other activities. Instead, he described its primary activities solely with respect to its criminal activity. By equating primary activities with criminal activities, McLeod failed to assess the degree to which SAS' criminal behavior encompassed its overall activities. Therefore, standing alone, McLeod's opinion about SAS' primary activities was insufficient to satisfy the primary activities requirement.

Still, we believe McLeod's testimony about the specific crimes SAS members have previously committed, coupled with the facts of the present case, constitute substantial evidence to satisfy the primary activities requirement. Tracing SAS' history as a criminal enterprise, McLeod testified they started out as a tagging or graffiti crew before changing gears around 2007. McLeod stated from that time, until Zavala's murder in February 2009, roughly 26 months, two SAS members (DeRobles and Vergara) were convicted of unlawful vehicle taking and three investigations were launched into illegal firearms possession by SAS members.

While McLeod was not asked about the results of those investigations, the gang statute does not require proof they led to a criminal conviction; rather, the prosecution was only required to show evidence of the *commission* of the statutorily enumerated offenses. (§ 186.22, subd. (f).) And McLeod's testimony made clear that illegal firearms possession was one of SAS' primary criminal activities. Indeed, it was one of the very few activities of any kind they were shown to take part in.

Appellants make much of the fact that only four types of illegal gun possession are included on the list of enumerated offenses. However, McLeod testified that in 2008, SAS member Moya illegally possessed a firearm in violation of section 12021, which is one those offenses. (§ 186.22, subd. (e)(31).) In addition, the evidence in the present case showed Castaneda carried a loaded firearm in violation of section 12031, which is also a statutorily enumerated offense. (§ 186.22, subd. (e)(32).)

The crime of murder is also on the list of qualifying offenses. (§ 186.22, subd. (e)(3).) Castaneda contends the jury was not entitled to consider Castaneda's actions in killing Zavala in determining the primary activities issue. However, "Nothing in [section 186.22] prohibits the trier of fact from considering the circumstances of the *present* or charged offense in deciding whether the group has as one of its primary activities the commission of one or more of the statutorily listed crimes. [¶] Evidence of past or *present* conduct by gang members involving the commission of one or more of the statutorily enumerated crimes is relevant in determining the group's primary activities." (*People v. Sengpadychith, supra,* 26 Cal.4th at p. 323, second italics added.)

Adding Castaneda's murder offense to the mix, the record contains substantial evidence SAS' primary activities consisted of the commission of two or more of the statutorily enumerated crimes to qualify as a criminal street gang. We therefore reject appellants' claim to the contrary.

19

III

Castaneda also contends there is insufficient evidence he knew SAS members engaged in a pattern of criminal activity, which was an essential element of the street terrorism charge and the special circumstances allegation.  (§ 186.22, subd. (a); *People v. Carr* (2010) 190 Cal.App.4th 475, 487-488.)  This contention also fails.

The knowledge requirement is designed to ensure the defendant's culpability rests on his own personal guilt, as opposed to guilt by association.  (*People v. Carr, supra*, 190 Cal.App.4th at pp. 487-488.)  As a matter of due process, a defendant cannot be punished for belonging to a gang if he is unaware of its criminal purposes.  (*Ibid*., citing *Scales v. United States* (1961) 367 U.S. 203 and *People v. Castenada* (2000) 23 Cal.4th 743.)  However, while the prosecution was required to prove Castaneda knew SAS was involved in the statutorily enumerated offenses, it was not required to prove he knew about the particular predicate offenses McLeod testified about.  (*Id*. at p. 488, fn. 13; *People v. Gamez* (1991) 235 Cal.App.3d 957, 975-976, disapproved on other grounds in *People v. Gardeley* (1996) 14 Cal.4th 605, 624, fn. 10.)

As to the knowledge issue, the record shows that, at the time of the shooting, Castaneda's home was laced with SSA graffiti, and he had a bear tattoo, reflecting his gang moniker, on his leg.  The contacts on his cell phone also contained the names and monikers of several SSA members, so his connection to the gang was well established.  Indeed, Castaneda does not challenge the jury's finding he was an active member of SSA at the time of the shooting.  Moreover, McLeod testified gang members tend to boast about the crimes they commit to garner respect.  Communication about guns is also common because weapons can be used to commit crimes that benefit the gang.  And when committing such crimes, gang members often back each other up, as illustrated in the present case.

20

Indeed, the facts show Medina solicited help after being confronted by rival gang members, and Castaneda quickly came to his aid and retaliated in brutal fashion by killing Zavala. The crime was precisely the type of pay back that gangs are known for. This could easily be viewed by the jury as reflecting not only Castaneda's active participation in SAS' criminal activities but also his desire to benefit and promote the gang. All told, the evidence was sufficient to support the jury's finding Castaneda knew SSA members engaged in a pattern of criminal activity. (See *People v. Carr, supra*, 190 Cal.App.4th at p. 488 [a defendant's active participation in a criminal street gang is usually sufficient to prove he was aware of the gang's criminal activities and purpose].)

IV

Next, we take up Luna's claim there is insufficient evidence to support the jury's finding with respect to the street terrorism charge that he willfully promoted, furthered or assisted felonious gang conduct, i.e., Zavala's murder. (§ 186.22, subd. (a).) The record contains substantial evidence to support that finding.

As a preliminary matter, we note that while Luna was acquitted of murder, that finding did not preclude his conviction for street terrorism. That's because in terms of mens rea, street terrorism only requires knowledge the gang has engaged in a pattern of criminal gang activity (§ 186.22, subd. (a)), whereas aiding and abetting liability requires knowledge the perpetrator intended to commit the subject offense (CALCRIM No. 3.01). In this case, it appears the jury found Luna had knowledge of SAS' criminal activities, but he did not know Castaneda intended to murder Zavala. That's a plausible scenario given the evidence did not reveal what Luna and Castaneda talked about before the shooting, and there was conflicting evidence as to whether Luna was driving the Jeep after the shooting.

Still, the jury could reasonably infer Luna assisted the murder by contacting Castaneda. We don't know what Luna said to Castaneda, but we do know that after Medina told him he was being threatened, Luna boldly proclaimed that he was going to

21

"go packing," which in gang parlance means to go get a gun. We also know from Medina's phone records that Medina did not call Castaneda on the day of the shooting. So, the most logical inference is that Luna informed Castaneda of what was going on with Medina. In fact, it appears Luna was the crucial go-between that conveyed Medina's plea for help to Castaneda, who then set out to avenge the Sick Heads' alleged mistreatment of Medina. The particular circumstances and timing of the events leading up to Zavala's murder were clearly such that the jury could reasonably find Luna willfully promoted, furthered or assisted the felonious gang conduct that resulted in Zavala's death. Therefore, we will not disturb Luna's conviction for street terrorism.

V

That brings us to appellants' instructional argument. They assert the court's instruction on the primary activities requirement was overbroad in terms of describing the type of crimes that qualify under the gang statute. The Attorney General agrees, but claims the error was not prejudicial. We find any error in the instruction's wording was harmless in light of all the evidence that was presented about SAS' activities.

In instructing the jury on the gang charges, the trial court identified three crimes as being potentially applicable to the primary activities requirement, murder, unlawful taking of a vehicle and "unlawful possession of firearms." The first two crimes are qualifying offenses, but as we have explained, the gang statute includes just four offenses involving illegal possession of a firearm. (See § 186.22, subd. (e)(23) [possessing a concealable firearm]; (e)(31) [possessing a firearm by a felon or drug addict]; (e)(32) [carrying a concealed firearm]; & (e)(33) [carrying a loaded firearm].) Because not all types of illegal weapons possession are relevant for purposes of the primary activities requirement, the trial court arguably erred by using the term "unlawful possession of firearms," instead of specifying the four types of possession listed in the statute.

22

However, any error that occurred was harmless under any standard. The jury only had to find SAS' primary activities consisted of two or more qualifying offenses. The evidence, as detailed above, showed two SAS members were convicted of unlawful taking of a vehicle and one was convicted of a qualifying weapons offense. In addition, Castaneda committed the qualifying offenses of carrying a loaded firearm and murder. On the other hand, there was no evidence SAS members engaged in any particular types of weapon possession offenses that are *not* listed in the gang statute. Therefore, there was no evidentiary foundation for the jury to misapply the court's instruction. Under these circumstances, appellants could not have been prejudiced by the court's lack of specificity. (Cf. *People v. Williams* (2009) 170 Cal.App.4th 587, 627 [upholding jury's findings on the gang charges even though trial court failed to specify what particular type of assault qualified as a predicate offense for purposes of the gang statute].)

## VI

Castaneda's sentencing claims are all that remain. The trial court sentenced him to life in prison without parole for committing gang-related murder as alleged in count one. (§ 190.2, subd. (a)(22).) Consecutive to that term, the court imposed a 25-years-to-life enhancement because Castaneda personally used a firearm to kill Zavala. (§ 12022.53, subd. (d), (e).) And on top of that, the court imposed a concurrent term of 10 years based on the jury's finding that, in murdering Zavala, Castaneda acted for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1)(C).) On count two, the court sentenced Castaneda to a concurrent term of two years for street terrorism.

The parties agree that because Zavala's murder formed the factual basis for the street terrorism charge, Castaneda's sentence for the latter offense must be stayed under section 654. (*People v. Mesa* (2012) 54 Cal.4th 191.) Accordingly, we will modify Castaneda's sentence to stay the two-year prison term he received for street terrorism.

Castaneda also contends that, instead of giving him 10 years for the gang enhancement, the court should have imposed a minimum parole eligibility period of 15 years. He points out that while section 186.22, subdivision (b)(1)(C) calls for a 10-year enhancement when the underlying crime is a violent felony such as murder, subdivision (b)(5) of that section states that "any person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served."

By committing first degree murder, Castaneda was subject to a term of 25 years to life in prison (§ 190, subd. (a)), which constitutes a life term for purposes of section 186.22, subdivision (b)(5). (*People v. Lopez* (2005) 34 Cal.4th 1002.) However, because the jury found the special circumstances allegation true, the court sentenced Castaneda to life in prison *without the possibility of parole*. (§ 190.2, subd. (a)(22).) Given that Castaneda is never going to be eligible for parole, it would be an idle act to attach a minimum parole eligibility period to his sentence. Indeed, the legislative history of the gang statute indicates section 186.22, subdivision (b)(5) was never intended to apply to defendants like Castaneda who are sentenced to life in prison without parole. (See *People v. Lopez, supra*, 34 Cal.4th at p. 1010; *People v. Montes* (2003) 31 Cal.4th 350, 358, fn. 10.) Therefore, with respect to count one, we affirm the trial court's decision to enhance Castaneda's sentence 10 years pursuant to section 186.22, subdivision (b)(1)(C).

For like reasoning, the imposition of a $5,000 parole revocation fine under section 1202.45, which is reflected in Castaneda's abstract of judgment, was improper because Castaneda was sentenced to life in prison *without the possibility of parole*. (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178.) The fact that on count two Castaneda received a determinate sentence to which the fine may properly attach (*People v. Brasure* (2008) 42 Cal.4th 1037, 1075) does not compel a different result. Because, Castaneda's sentence on that count must be stayed per section 654 (see above), his parole

24

revocation fine must be stricken. (*People v. Carr, supra*, 190 Cal.App.4th at p. 482, fn. 6.)

## DISPOSITION

Castaneda's sentence is modified to stay his sentence on count two for street terrorism pursuant to section 654 and to strike his parole revocation fine. The clerk of the trial court is directed to prepare an amended abstract of judgment reflecting those changes and send a certified copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


FYBEL, J.