Filed 1/14/14  P. v. Perez CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B238303 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA112332) |
| v. | |
| ANTONIO PEREZ et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Ricardo R. Ocampo, Judge.  Affirmed.

Melanie K. Korian, under appointment by the Court of Appeal, for Defendant and Appellant Antonio Perez.

Alan Stern, under appointment by the Court of Appeal, for Defendant and Appellant Jacori Armon Williams.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Robert M. Snider, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants, Antonio Perez and Jacori Armon Williams, appeal their convictions for premeditated attempted murder, assault with a firearm, shooting at an occupied vehicle, and possession of a firearm by a felon, with firearm, criminal street gang enhancements, and prior serious felony conviction enhancements (Pen. Code, §§ 664, 187, 245, subd. (a)(2), 246, former 12021, 186.22, subd. (b), 667, subds. (b)-(i)).[1] Perez was sentenced to state prison for a term of 231 years to life. Williams was sentenced to state prison for a term of 195 years to life.

The judgments are affirmed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

The Front Hood Crips gang frequented West 137th Street in Compton. Front Hood's rivals included the B-13s, a Latino gang whose members had been moving into some of the apartments on 137th Street. In addition, the Front Hood Crips were engaged in an ongoing gang war with several other African American gangs. Defendants Perez and Williams were Front Hood members.

a. *The April 4, 2010, shooting.*

On April 4, 2010[2], L.T. was living with his grandmother on the 800 block of West 137th Street. That morning, as L.T. and his uncle walked to the market, L.T. noticed the defendants standing next to Perez's minivan. On his way back home, L.T. saw defendants talking with five or six people. Williams walked over to L.T., approached to within a few inches of him, said "I am Ice from Front Hood," and asked what gang L.T. was from. L.T. answered "Nowhere," turned away and continued

---

[1]    All further references are to the Penal Code unless otherwise specified.

[2]    All further date references are to the year 2010 unless otherwise specified.

walking home with his uncle. Although L.T. had tattoos all over his body, he testified they were not gang-related.

Later that same day, L.T. was in front of the house washing his grandmother's car when Perez drove up in the minivan and blocked the driveway. Williams emerged from the van's passenger side, walked over to the sidewalk, extended his arm straight out and pointed a semiautomatic handgun at L.T.. Without saying a word, Williams pulled the trigger rapidly three or four times. L.T. ducked behind his grandmother's car. L.T.'s uncle came out of the garage, walked up to Williams and said, "Naw, this ain't about to happen." Williams returned to the van and the defendants drove off. L.T. later found an unfired bullet on the ground where Williams had been standing when he pulled the trigger.

By the time of trial, L.T. was afraid for himself and his family because people were saying he would be killed if he testified. A few weeks before trial, two men confronted him near the courthouse and asked if he was testifying against their homeboy. When L.T. said it was none of their business, they threatened him. L.T. recognized one of them as a member of the Front Hood Crips.

b. *The April 18 shooting.*

On April 17, while he was with Perez, Williams was shot in the leg.

The following afternoon, a gold sedan carrying four men drove down the 800 block of West 137th Street. Perez shot at the car from one side of the street and then from the other side. W.S., who was acquainted with Perez, witnessed the shooting. Afterward, W.S. saw Perez go into Williams's apartment. The police recovered six .45-caliber shell casings and one expended round from the scene.

W.S. believed the defendants were gang members and he was afraid for his family if he testified.

c. *The April 19 shooting.*

On the afternoon of April 19, W.S. witnessed a second shooting. He saw a man entering a parked truck. Then he saw Williams come down the stairs of an apartment complex and shoot at the truck.

3

The victim of this shooting, F.S., testified he had been dropping off two employees at their homes on the 800 block of 137th Street when someone started shooting at his truck. F.S. thought he heard someone in a nearby group of people say, just before the shooting, "That's him," or "That's them." The truck was hit numerous times, but F.S. kept on driving.

The police recovered nine expended .45-caliber shell casings from around the stairs and bullet fragments from the street. The forensic evidence showed the same gun had been used in both the April 18 and the April 19 shootings.

The prosecution gang expert, Brian Richardson, testified gang members often share a handgun communally: "Gang members usually pass their gun from gang member to gang member. Often, a gang member, if he needs to go put in some work, you go get a gang gun or a hood gun. A hood gun is a gun that is passed throughout the hood. When I say hood, I am talking about that particular gang. And it is used numerous times." Richardson also testified that, during the L.T. incident, Perez had probably been "acting as a recorder or observer" who would "go back and tell other gang members that [Williams] is willing to put in . . . work."

2. *Defense evidence.*

Neither defendant testified.

According to one of the officers who responded to the scene, L.T. did not say Williams had introduced himself as Ice from Front Hood. L.T. said that when he was washing the car outside his grandmother's house he was by himself, not with his uncle, and that Williams pulled the trigger once, not four times.

In March 2010, Williams began living part-time with his aunt at her West 137th Street apartment. Around 1:00 p.m. on April 4, Williams and his girlfriend arrived at the aunt's apartment for dinner. When his girlfriend left around 4:00 p.m., Williams was still there. After she returned at 6:00 or 7:00 p.m., she and Williams stayed at his aunt's apartment almost until midnight.

4

For a month after he was shot in the leg on April 17, Williams could not walk without limping slightly and he was unable to run. W.S. had told a detective that on April 19 he saw the gunman running.

## CONTENTIONS

1. There was insufficient evidence to sustain the convictions arising out of the L.T. shooting on April 4.

2. There was insufficient evidence to sustain the premeditation and deliberation findings related to the April 18 and 19 shootings.

3. The trial court erred by consolidating the L.T. case to the other two shooting incidents.

4. There was insufficient evidence to sustain Williams's Three Strikes enhancement.

## DISCUSSION

1. *There was sufficient evidence to sustain the convictions arising out of the L.T. incident on April 4.*

Defendants contend their convictions for attempted murder and aggravated assault arising out of the April 4 incident, when Williams confronted L.T. with a handgun, must be reversed. They argue the required intent for those offenses was missing because there was insufficient evidence the gun had been loaded and, even if it had been loaded, the evidence showed the gun was inoperable. This claim is meritless.

 a. *Legal principles.*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the

5

light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

" 'An appellate court must accept logical inferences that the [finder of fact] might have drawn from the circumstantial evidence.' [Citation.] 'Before the judgment of the trial court can be set aside for the insufficiency of the evidence, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the [finder of fact].' [Citation.]" (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) As our Supreme Court said in *People v. Rodriguez, supra,* 20 Cal.4th 1, while reversing an insufficient evidence finding because the reviewing court had rejected contrary, but equally logical, inferences the jury might have drawn: "The [Court of Appeal] majority's reasoning . . . amounted to nothing more than a different weighing of the evidence, one the jury might well have considered and rejected. The Attorney General's inferences from the evidence were *no more inherently speculative* than the majority's; consequently, the majority erred in substituting its own assessment of the evidence for that of the jury." (*Id.* at p. 12, italics added.)

"A long line of California decisions holds that an assault is not committed by a person's merely pointing an (unloaded) gun in a threatening manner at another person. . . . [In this case], we address the required quantum of circumstantial evidence necessary to demonstrate present ability to inflict injury and thus to sustain a conviction of assault with a firearm." (*People v. Rodriguez, supra,* 20 Cal.4th at p. 11, fn. 3.)

6

"California courts have often held that a defendant's statements and behavior while making an armed threat against a victim may warrant a jury's finding the weapon was loaded." (*Id*. at p. 12.)

      b. *Discussion*.

The encounter with L.T. began when Williams detached himself from a group of people and confronted L.T. with the standard gang challenge, "Where are you from?" L.T. responded by saying he was not affiliated with any gang. The prosecution gang expert testified L.T. would have been seen as having insulted Williams in front of his peers. Just a few hours later, now armed with a semiautomatic pistol, Williams got out of Perez's car, walked over to L.T., aimed the gun at him and pulled the trigger three or four times. After Williams left, an unfired bullet was found at the spot where he had been standing.

This amounted to sufficient circumstantial evidence that Williams's gun was loaded. (See *People v. Rodriguez, supra,* 20 Cal.4th at p. 14 [evidence showing defendant had "armed himself and gone hunting for" the victim would suggest defendant's weapon was loaded]; *People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 542, italics added ["Lochtefeld's acts in threatening persons on the street *and in pointing the gun at officers* demonstrated his implied assertion the [pellet] gun was sufficiently charged [with CO2] to inflict injury"].)

Defendants' additional claim, that even if the gun had been loaded, Williams lacked the "present ability" to commit an assault because it was inoperable, is meritless. Our Supreme Court has recognized that a gun's jammed magazine does not necessarily negate a present ability to commit an armed assault. In *People v. Chance* (2008) 44 Cal.4th 1164, our Supreme Court approved the following analysis by *People v. Ranson* (1974) 40 Cal.App.3d 317: "Ranson aimed a rifle at a police car. After the police shot and disarmed him, it was discovered that there was no round in the chamber because a cartridge was jammed in the magazine. [Citation.] The *Ranson* court noted that while an unloaded gun does not confer 'present ability,' the element is satisfied if the defendant wields an automatic rifle with cartridges in the magazine, even if the firing

7

chamber is empty. [Citation.]" (*People v. Chance, supra,* 44 Cal.4th at p. 1172, fn. omitted.) "The *Ranson* court held the evidence of present ability sufficient, even though Ranson had to do much more than turn around to use his weapon against the police. He had to remove the clip, dislodge a jammed cartridge, reinsert the clip, chamber a round, point the weapon, and pull the trigger. [Citation.]" (*Id.* at p. 1173, fn. omitted.)

Here, the prosecution firearms expert explained how a jam could have occurred if the magazine had not been properly seated in the weapon, and how such a jam could have been cleared. Perez argues the jury could not have rationally concluded Williams had sufficient time to shoot after clearing the jam because "*immediately* after he heard the clicking sound, [L.T.] ducked and his uncle charged up to Williams, who then jumped in the car and fled the scene." (Italics added.) But L.T.'s testimony did not necessarily lead to that conclusion. L.T. testified he ducked behind the car after hearing Williams pull the trigger, and then "*[a]fter that*, my uncle had come out and told them like, 'Naw, this ain't about to happen.' " (Italics added.) L.T. also testified, "[M]y uncle, he was in the garage when it happened. *So he came out of the garage and told them*, 'No. This is not about to happen.' " (Italics added.) The jury could have reasonably inferred Williams had sufficient time to clear a jam.

There was sufficient evidence to sustain defendants' convictions arising out of the L.T. incident.

2. *Sufficient evidence to sustain the premeditation and deliberation findings related to the April 18 and 19 shootings.*

Defendants claim there was insufficient evidence to sustain the premeditation and deliberation findings made by the jury in connection with the attempted murder convictions against Perez for the April 18 shooting, and against Williams for the April 19 shooting. These claims are meritless.

8

a. *Legal principles.*

*People v. Anderson* (1968) 70 Cal.2d 15, 26-27, a murder case, discussed the following types of premeditation and deliberation evidence:[3] "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing – what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [Citation.]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2). [¶] Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)."

The *Anderson* factors do not establish normative rules, but instead provide guidelines for a reviewing court's analysis. (*People v. Sanchez* (1995) 12 Cal.4th 1, 32, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Thus, the *Anderson* factors are not a sine qua non to finding deliberation and

---

[3]   "We do not distinguish between attempted murder and completed first degree murder for purposes of determining whether there is sufficient evidence of premeditation and deliberation. [Citation.]" (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1462, fn. 8, disapproved on other grounds in *People v. Mesa* (2012) 54 Cal.4th 191.)

9

premeditation, nor are they exclusive. (*People v. Sanchez, supra,* at pp. 32-33; *People v. Davis* (1995) 10 Cal.4th 463, 511 [*Anderson* factors are descriptive, not normative].)

b. *Discussion.*

(1) *April 18.*

On April 18, Perez fired multiple shots at a car driving down the 800 block of West 137th Street. There were four African Americans in the car. Perez then crossed the street and continued to shoot at the car. Perez argues the evidence showed no more than an impulsive, unpremeditated act on his part. We disagree.

The prosecution gang expert Brian Richardson testified that, precisely at the time of this shooting, there had been a major street war going on between the Front Hood Crips and three other African American gangs. Richardson testified about "the gang right across the street, Fruit Town Piru, which at the time there was a major street war, a gang war going on between the two gangs, as well as other gangs that I mentioned earlier . . . Corner Pocket and Anzac Grape Street Crips." Richardson testified there had been shootings going on "with Fruit Town in particular during that week or two period."

Gang rivalry, even if the victim is merely suspected of belonging to a rival gang, can provide evidence of motive and may prove premeditation and deliberation. For example, *People v. Williams* (1997) 16 Cal.4th 153, 194, held the trial court did not err by denying a motion to exclude gang evidence, reasoning in part as follows: "Defendant argues the issue of gang hostility as a motive was not reasonably raised because the prosecution failed to adduce any evidence that the victim, Dunn, was a gang member. The contention fails for the obvious reason that defendant's alleged motive to kill Crips was just as arguable on facts suggesting (as they did) that the victim was dressed *like* a Crip when he was shot, as it would have been on facts suggesting he actually *was* a Crip. Similarly, contrary to defendant's characterization, the prosecution did not stake the relevance of its gang evidence on Dunn's having been shot in recognized Blood 'territory.' The prosecution argued only that the area where Dunn died was frequented by Bloods as well as Crips, such that the area would occasionally be the scene of conflict between the two groups."

10

Given the context of an ongoing violent gang war, evidence that Perez might have believed the gold sedan carried rival gang members would have explained this otherwise completely inexplicable shooting. Richardson testified it would raise Perez's status within the gang to shoot at people he suspected of belonging to the Fruit Town Pirus or either of the other two gangs with which the Front Hood Crips were at war.

Perez points out he "is not challenging the attempted murder conviction itself; he is arguing that the attempted murders *were not premeditated or deliberate*." Perez's theory, that the evidence only showed a shooting "consistent with what courts have described as 'rash impulse,' and an 'unpremeditated impulsive explosion of violence,' rather than a carefully thought-out and planned shooting, even if the motive was gang-related," is implausible.

Much more likely is the scenario that Perez suspected the car contained rival gang members and, in the context of an ongoing gang war, when presented with an opportunity to shoot at rival gang members, Perez needed little time to decide what to do. " 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . . " [Citations.]' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) "Premeditation can be established in the context of a gang shooting even though the time between the sighting of the victim and the actual shooting is very brief. [Citation.]" (*People v. Sanchez* (2001) 26 Cal.4th 834, 849.) In addition, there were about 10 shots fired, which also tends to show premeditation and deliberation. (See *People v. Silva* (2001) 25 Cal.4th 345, 369 ["The manner of killing – multiple shotgun wounds inflicted on an unarmed and defenseless victim who posed no threat to defendant – is entirely consistent with a premeditated and deliberate murder."]; *People v. Herrera, supra,* 70 Cal.App.4th at p. 1464, disapproved on other grounds in *People v. Mesa, supra,* 54 Cal.4th 191 [dozen shots fired during drive-by shooting was evidence of premeditation and deliberation].)

11

There was sufficient evidence to sustain the jury's premeditation and deliberation findings in connection with Perez's attempted murder convictions for the April 18 shooting.

(2) *April 19.*

Williams makes practically the same argument as Perez, but in his situation the argument is much weaker. The evidence, that just before Williams fired a flurry of shots someone said, "there he is" or "there they are," tended to show these victims had been purposely targeted. As the Attorney General points out, "[O]f Williams' three victims, [one] was a member of the B-13s and [F.S.] was an associate of that gang." The evidence showed 12 or 13 shots had been fired, again indicating the shooting had been deliberate and premeditated. (See *People v. Silva, supra,* 25 Cal.4th at p. 369; *People v. Herrera, supra,* 70 Cal.App.4th at p. 1464.)

Like Perez, Williams argues "[t]he simple truth is [he] had no idea who was in the car he impulsively and rashly and without reflection fired upon and no gang motive for doing so." Williams asserts he "simply came down the stairs and immediately impulsively and without thought or reflection started firing his gun at a passing truck." But this is just jury argument, and highly implausible at that.

We conclude there was sufficient evidence to sustain the jury's premeditation and deliberation findings in connection with the attempted murder convictions against Williams for the April 19 shooting.

3. *Joinder was proper.*

Perez contends the trial court erred by joining for trial the L.T. incident with the two car shootings. He argues that "not only was the evidence not cross-admissible in separate trials, but the consolidation allowed the prosecution to bolster its attempted murder case involving [L.T.], which was otherwise weak." This claim is meritless.

12

a. *Legal principles.*

"Section 954 governs the issue of joinder of counts and it provides in pertinent part: 'An accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of *the same class of crimes or offenses*, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately.' (Italics added.) . . . [¶] [If t]he statutory requirements for joinder [are] satisfied, defendant ' "can predicate error in denying the motion only on a clear showing of potential prejudice. [Citation.] We review the trial court's ruling on the severance motion for abuse of discretion." [Citations.]' [Citation.]" (*People v. Jones* (2013) 57 Cal.4th 899, 924-925.)

"The determination of prejudice is necessarily dependent on the particular circumstances of each individual case, but certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial. Thus, refusal to sever may be an abuse of discretion where '(1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all; and (4) any one of the charges carries the death penalty.' [Citation.]" (*Frank v. Superior Court* (1989) 48 Cal.3d 632, 639.) Section 954.1 specifically provides that cross-admissibility is not required: "[E]vidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact." On the other hand, "[i]f the evidence underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges." (*People v. Soper* (2009) 45 Cal.4th 759, 774-775; see also *People v.*

13

*Cunningham* (2001) 25 Cal.4th 926, 985 ["complete cross-admissibility is not necessary to justify the joinder of counts"].)

        b. *Discussion*.

The trial court granted the prosecution's motion to consolidate these cases, ruling: "I do find that there's sufficient similarity of class of crimes[,] of . . . similar intent. There's cross-admissibility of [Evidence Code section] 1101(b) evidence, and while there is prejudice to the defendants to consolidate these cases, I don't find that it rises to the level of substantial prejudice to outweigh the factors that . . . would permit the granting of the motion."

Perez concedes all three cases involved the same class of offense and, therefore, that consolidation was proper under section 954, but he argues the evidence was not cross-admissible and "the consolidation resulted in a conviction for attempted murder, which was not supported by substantial evidence." He asserts "there were virtually no factual similarities between the first case and the subsequent shootings," and that the L.T. incident "involved a personal vendetta [while] the other two pertained to controlling one's neighborhood."

But the "differences" Perez points to amount to no more than minor factual details, e.g., that L.T. was not "driving in his car with multiple occupants on 137th Street," and there was no evidence either defendant "believed [L.T.] to be a rival gang member." All three incidents occurred on the same city block within a 16-day period. All three incidents apparently involved a gang motivation. All three incidents involved the same two perpetrators, and the evidence showed they shared the same gun that had been used in two of the incidents. Moreover, the gang-related motive and intent evidence, generated by all three incidents, was crucial to understanding these otherwise inexplicable crimes. And contrary to Perez's assertion, there was nothing weak about the L.T. case.

The trial court did not err by ordering consolidation of these cases.

14

4. *There was sufficient evidence of Williams's Three Strikes prior*.

Williams contends there was insufficient evidence to support imposition of a Three Strikes sentence based on his federal bank robbery conviction. This claim is meritless.

a. *Background*.

At trial, the prosecution put into evidence two exhibits for the purpose of establishing that Williams's conviction for federal bank robbery, in violation of title 18 United States Code section 2113, constituted a Three Strikes-qualifying prior.

One exhibit consisted of a judgment and commitment order showing that in 2005 codefendant Perez pled guilty to armed bank robbery in violation of title 18 United States Code section 2113(a)(d), and brandishing a weapon during the commission of a violent crime in violation of title 18 United States Code section 924(c). Attached to this judgment and commitment order was a copy of a First Superseding Indictment charging that in February 2000, Perez, Williams and a third person had robbed the Star Harbor Federal Credit Union in Rancho Dominguez, California. According to this indictment, Williams personally used a firearm during the robbery.

The second exhibit consisted of a certified CLETS (California Law Enforcement Telecommunications System) computer printout showing that, following his arrest in October 2000, Williams was convicted of violating title 18 United States Code section 2113(a)(d), sentenced to 130 months in prison, and eventually began a term of supervised release in March 2010.

At trial, defense counsel made hearsay and lack of foundation objections to these exhibits, but did not argue the evidence was otherwise insufficient to prove the existence of this prior conviction. The trial court concluded the prior strike had been proven beyond a reasonable doubt.

b. *Legal principles.*

"The People must prove all elements of an alleged sentence enhancement beyond a reasonable doubt. [Citation.] Where, as here, the mere fact of conviction under a particular statute does not prove the offense was a serious felony, otherwise admissible evidence from the entire record of the conviction may be examined to resolve the issue. [Citations.] This rule applies equally to California convictions and to those from foreign jurisdictions. [Citations.]" (*People v. Miles* (2008) 43 Cal.4th 1074, 1082.)

"However, if the prior conviction was for an offense that can be committed in multiple ways, and the record of the conviction does not disclose how the offense was committed, a court must presume the conviction was for the least serious form of the offense. [Citations.] In such a case, if the serious felony nature of the prior conviction depends upon the particular conduct that gave rise to the conviction, the record is insufficient to establish that a serious felony conviction occurred. [¶] On the other hand, the trier of fact may draw *reasonable inferences* from the record presented. Absent rebuttal evidence, the trier of fact may presume that an official government document, prepared contemporaneously as part of the judgment record and describing the prior conviction, is truthful and accurate. Unless rebutted, such a document, standing alone, is sufficient evidence of the facts it recites about the nature and circumstances of the prior conviction. [Citations.] [¶] On review, we examine the record in the light most favorable to the judgment to ascertain whether it is supported by substantial evidence." (*Id.* at p. 1083.)

Title 18 United States Code section 2113(a) provides: "Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or [¶] Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan

16

association, or building, or part thereof, so used, any felony affecting such bank[, credit union,] or such savings and loan association and in violation of any statute of the United States, or any larceny – [¶] Shall be fined under this title or imprisoned not more than twenty years, or both."

Section 2113(d) provides: "Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined under this title or imprisoned not more than twenty-five years, or both."

"The California serious felony of bank robbery substantially coincides with the offense described in the *first* paragraph of section 2113(a) . . . . However, there is no California serious felony that corresponds to the crime described in the *second* paragraph of section 2113(a). Thus, evidence that the defendant suffered a previous conviction under section 2113(a), standing alone, cannot establish that the conviction was for a serious felony under California law." (*People v. Miles, supra,* 43 Cal.4th at pp. 1081-1082, fns. omitted.)

c. *Discussion.*

Citing *People v. Jones* (1999) 75 Cal.App.4th 616, Williams argues there was insufficient evidence his violation of section 2113 constituted a prior serious felony conviction for Three Strikes purposes. But the problem in *Jones* was that, although the defendant had originally been *charged* by indictment with violating title 18 United States Code sections 2113(a) and 2113(d), he was ultimately convicted only for violating the "lesser included offense" of section 2113(a). In this situation, *Jones* held: "The evidence presented by the People did not suffice to disclose the facts of the prior offense actually committed, and therefore the trial court should have presumed that the prior conviction was for the least offense punishable under the federal law, which did not constitute a serious felony strike. [Citations.]" (*People v. Jones, supra,* at p. 635.) But that problem did not exist here because the evidence shows Williams had been convicted for the *aggravated* form of the offense defined by the first paragraph of section 2113(a).

17

Certified rap sheets are admissible to prove the fact of prior convictions. (*People v. Morris* (2008) 166 Cal.App.4th 363, 367-368.)  Here, the CLETS rap sheet not only reflects Williams's conviction for violating "2113(a)(d)," but an additional notation reads:  "armed bank robbery."  This notation tended to show Williams had committed the aggravated form of federal bank robbery.  (See *People v. Miles, supra,* 43 Cal.4th at p. 1085 ["Where . . . the statutory provision includes more than one form of offense, one may reasonably infer, absent contrary indicia, that the additional prose notation is not mere surplusage, but an attempt to delineate which form was violated."].)  That Williams's CLETS rap sheet may have contained a minor clerical error, describing him as 5 feet tall and weighing 90 pounds, does not materially impair the value of this evidence.  In any event, there was more evidence showing the nature of Williams's prior conviction.

A charging document is part of the record for purposes of determining the substance of a foreign conviction.  (See *People v. Towers* (2007) 150 Cal.App.4th 1273, 1285, fn. 11 [Tennessee indictment]; *People v. McMahan* (1992) 3 Cal.App.4th 740, 745-746 [Missouri indictment].)  Here, the federal indictment describes an armed robbery during which Williams personally used a firearm, which constitutes more evidence about the nature of his prior.  (See *People v. Miles, supra,* 43 Cal.4th at p. 1088, fns. Omitted ["It is highly unlikely that one charged and convicted under section 2113(a) only for entering a bank with felonious or larcenous intent, without an attempted or actual taking of property by force and violence or intimidation, would also be found, in the course of the offense, to have placed a victim's life in jeopardy by use of a dangerous weapon and to have taken a hostage.  In the absence of any rebuttal evidence as to the nature of the prior conviction, the trial court was entitled, prima facie, to draw the more reasonable inference that it was for committing the California serious felony of bank robbery."].)

Hence, there was sufficient evidence to sustain the finding that Williams suffered a prior felony conviction for purposes of the Three Strikes law.

**DISPOSITION**

The judgments are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

KITCHING, J.

ALDRICH, J.

19