[No. D031877. Fourth Dist., Div. One. Jan. 11, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL BERNARD LOCHTEFELD, Defendant and Appellant.

534

COUNSEL

Joel K. Liberson, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Esteban Hernandez and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BENKE, J.**—Penal Code section 245, subdivision (c)[1] punishes "an assault *with a deadly weapon or instrument, other than a firearm,* or by any means likely to produce great bodily injury upon the person of a peace officer . . . ." (Italics added.) ██ As has been often noted, a pellet gun[2] is clearly an instrument other than a firearm. (See, e.g., *In re Jose A.* (1992) 5 Cal.App.4th 697, 700-701 [7 Cal.Rptr.2d 44].) Courts have found pellet guns to be deadly or dangerous weapons in the context of other penal statutes.[3] May a pellet gun also, as a matter of law, be a deadly weapon within the meaning of section 245? The question does not appear to have been answered. We hold that the pellet gun used here was, as a matter of law, a deadly weapon within the meaning of section 245.

FACTS

Daniel Bernard Lochtefeld (Lochtefeld) was a resident of the Pine Hotel on Front Street in downtown San Diego. On September 23, 1997, a fellow resident, Carolyn Scott, saw Lochtefeld standing outside the hotel waving a big handgun in the air. Scott told the hotel manager, Vivian Caparell, that Lochtefeld was walking around with a gun in his hand.

Scott continued to watch Lochtefeld, and saw him at a bus stop where a man and an African-American woman were sitting. Lochtefeld had the gun

---

[1]All statutory references are to the Penal Code.

[2]Compressed air or $CO_2$ guns may fire small round pellets, also known as "BB's," or larger-diameter pellets (see, e.g., *People v. Sherman* (1967) 251 Cal.App.2d 849, 856 [60 Cal.Rptr. 198], which involved a "$CO_2$ Plainsman .175 pellet gun"). For convenience, we refer to compressed air/$CO_2$ guns that expel projectiles as "pellet guns."

[3]See, e.g., *People v. Schaefer* (1993) 18 Cal.App.4th 950, 951 [22 Cal.Rptr.2d 536], holding a pellet gun used in the commission of a felony is a deadly or dangerous weapon for purposes of imposing a section 12022, subdivision (b) enhancement.

in his pocket, with the handle sticking out and his hand on it. Lochtefeld said, "I hate niggers and if you don't move, I'm going to shoot you." The woman then ran down the street, and Lochtefeld boarded a bus. Caparell, who also observed Lochtefeld threatening the woman at the bus stop, thought Lochtefeld was "going to kill the lady," and so Caparell called the police.

San Diego Police Officers Hensley, Robertson, and Cali went to Lochtefeld's room at the Pine Hotel and knocked on the door. No one answered. The officers continued knocking, and announced they were police officers investigating a crime. Although there was still no response, the officers could hear someone moving in the room. Officer Hensley told Lochtefeld that the police were not going to go away, but Lochtefeld angrily called out for the police to go away, and refused to open his door.

At one point, the officers heard a metal-on-metal noise that sounded like the operating mechanism of a semiautomatic pistol, and Hensley told the others, "That sounded like a gun." While another officer got a master key from Caparell, Hensley called his supervisor, Sergeant Stetson. Stetson came to the Pine Hotel with his supervisor, Lieutenant McGinley. When Lochtefeld also refused to open his door for McGinley, the lieutenant used the master key to open Lochtefeld's door.

McGinley and Hensley leaned into the room and saw Lochtefeld sitting on his bed, pointing his gun directly at them. (McGinley said Lochtefeld was "pointing a gun at my head" and had his finger on the trigger.) Hensley jumped back, and McGinley called out, "He has a gun." McGinley had his weapon pointed at Lochtefeld's head. As he began to pull the trigger, he realized Lochtefeld's weapon was a pellet gun.

McGinley twice ordered Lochtefeld to put down his weapon or be shot. Lochtefeld complied, and was handcuffed. Hensley then unloaded the six or seven pellets in Lochtefeld's weapon, which was a replica of a Smith & Wesson nine-millimeter semiautomatic pistol, and took it outside. Hensley test-fired the unloaded pellet gun five or six times to see if it was functional, and each time a burst of compressed $CO_2$ was expelled.

Eugene Wolberg, a criminalist specializing in firearms for almost 20 years, examined Lochtefeld's gun. The magazine of Lochtefeld's weapon holds 15 pellets. A burst of compressed $CO_2$ projects the pellets out the barrel "very much like a firearm." Wolberg inserted a fresh $CO_2$ cylinder and then test-fired 15 full magazines through the gun.

The first few magazines Wolberg fired expelled projectiles at velocities over 380 feet per second, and by the 10th magazine (150 pellets), the projectile velocity still averaged 300 feet per second. Over the next four magazines, the projectile velocity dropped to 81 feet per second, and after one or two shots from the 15th magazine, the $CO_2$ cylinder was empty.

Wolberg testified that his review of the relevant literature indicated that a velocity of 300 to 360 feet per second would go through human skin and penetrate muscle tissue to a depth of about one inch and a half. Pellet velocities above 250 feet per second would penetrate an eyeball.

With respect to Lochtefeld's gun, of the 210 pellets fired, the first 150 would penetrate skin and reach a depth of one inch and a half into muscle tissue, while the first 165 pellets fired would penetrate an eyeball. Pellet guns range from children's BB guns firing BB's under 200 feet per second, which are unlikely to cause injury, to "adult" pellet guns that can expel projectiles over 650 feet per second, which can be lethal. Lochtefeld's weapon was in the middle range, firing the pellets at an average of 350 feet per second. While Lochtefeld's gun was unlikely to cause a fatality, in Wolberg's opinion the gun was capable of inflicting "significant injury."

Although Lochtefeld did not testify, his counsel argued in closing that there was insufficient proof Lochtefeld's gun was a deadly weapon because, if the cylinder were substantially drained, the weapon would be unlikely to produce great bodily injury. The prosecutor argued Lochtefeld's conduct in using the gun and threatening to shoot people indicated the weapon was in normal operating condition, i.e., a deadly weapon.

## PROCEDURE

By information filed October 17, 1997, the District Attorney of San Diego County accused Lochtefeld of one count of assault with a deadly weapon on a peace officer and personal use of a deadly weapon in violation of sections 245, subdivision (c), and 1192.7, subdivision (c)(23); in a second count of assault with a deadly weapon in violation of section 245, subdivision (a)(1); and in a third count of making a terrorist threat in violation of section 422.

Lochtefeld's counsel made a pretrial motion to dismiss the information under section 995, which was granted as to the third count only. At the close of the People's case, counsel's section 1118.1 motion for acquittal of the second count was granted, with the first count only going to the jury.

On May 14, 1998, the jury returned its verdict finding Lochtefeld guilty of assault with a deadly weapon on a peace officer in violation of section

245, subdivision (c), with a true finding Lochtefeld was personally armed with a deadly weapon in the commission of the offense within the meaning of section 1192.7, subdivision (c)(23). On July 15, 1998, Lochtefeld was sentenced to a term of four years in state prison. Lochtefeld filed his notice of appeal on August 26, 1998.

## STANDARD OF REVIEW

■ Our review of sufficiency of the evidence claims is a highly deferential one: "In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618].)

## DISCUSSION

Lochtefeld argues there was insufficient evidence adduced to support a finding his pellet gun was a deadly weapon, or that it was sufficiently charged with $CO_2$ so that he then had the present ability to inflict injury with it. We disagree.

### A. *Deadly Weapon*

The jurors were instructed, pursuant to a modified version of CALJIC No. 9.02, that "[a] deadly weapon is any object, instrument, or weapon which is used in such a manner as to be capable of producing, and likely to produce, death *or great bodily injury*." (Italics added.) "Great bodily injury" was defined as "significant or substantial bodily injury or damage." This instruction correctly sets out the law.

■ "As used in section 245, . . . a 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of

producing and likely to produce, death or great bodily injury.' [Citation.] Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such." (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028-1029 [68 Cal.Rptr.2d 655, 945 P.2d 1204],[4] citing *People v. Graham* (1969) 71 Cal.2d 303, 327 [78 Cal.Rptr. 217, 455 P.2d 153],[5] disapproved on other grounds in *People v. Ray* (1975) 14 Cal.3d 20, 32 [120 Cal.Rptr. 377, 533 P.2d 1017].)

Although the terms "dangerous" or "deadly" were used in the disjunctive in many statutes, with regard to "inherently deadly" weapons, the latter category includes the former. As the Supreme Court has pointed out: "When loaded, a 'gun is unquestionably a dangerous and deadly weapon'; even when unloaded, it is at least a 'dangerous weapon.' [Citation.]" (*In re Christopher R.* (1993) 6 Cal.4th 86, 94 [23 Cal.Rptr.2d 786, 859 P.2d 1301].)

The classical distinction between these two states is that a loaded gun is a deadly weapon per se, but even an unloaded gun—a large metal object— may be used as a bludgeon, and "it is at least a 'dangerous weapon.' " (*In re Christopher R., supra,* 6 Cal.4th at p. 94.)

Other courts have found that pellet guns are deadly weapons within the meaning of the statutes punishing robbery: "[T]he evidence demonstrates that Exhibit 1 is a 'deadly weapon' under section 211a.[6] We have examined the weapon—a $CO_2$ Plainsman .175 pellet gun—and while the safety has

---

[4]The *Aguilar* court also noted that "[o]ther objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury." (*People v. Aguilar, supra,* 16 Cal.4th at p. 1029; see also *People v. Simons* (1996) 42 Cal.App.4th 1100, 1107 [50 Cal.Rptr.2d 351], holding a screwdriver to be a deadly weapon as employed in that case.) The People argue that even if Lochtefeld's pellet gun were not a deadly weapon as a matter of law, the manner in which he used it established its character as such, so that even if our "inherently deadly" conclusion as to the pellet gun were in error, Lochtefeld would still not be entitled to a reversal. The point is correct.

[5]The list of inherently deadly weapons in *Graham* included: " '. . . There are, first, those instrumentalities which are weapons in the strict sense of the word . . . . [Instruments] such as guns, dirks and blackjacks, which are weapons in the strict sense of the word and are "dangerous or deadly" to others in the ordinary use for which they are designed, may be said as a matter of law to be "dangerous or deadly weapons." . . .' " (*People v. Graham, supra,* 71 Cal.2d at p. 327, quoting *People v. Raleigh* (1932) 128 Cal.App. 105, 108-109 [16 P.2d 752].)

[6]Former section 211a formerly provided that a robbery "perpetrated . . . by a person being armed with a dangerous or deadly weapon . . . is robbery in the first degree." (Stats. 1961, ch. 1874, § 1, p. 3975, repealed by Stats. 1986, ch. 1428, § 1, p. 5123.) (Use of a "dangerous or deadly weapon" no longer determines the degree of the crime, now specified in § 212.5.) Lochtefeld attempts to distinguish "deadly weapons" from "deadly or dangerous weapons." While the words "dangerous" and "deadly" in former section 211a were used in the disjunctive (*People v. Aranda* (1965) 63 Cal.2d 518, 532 [47 Cal.Rptr. 353, 407 P.2d 265]), we discuss herein only those precedents involving "deadly" weapons.

been broken off, the weapon is functioning. . . . The owner of the gun . . . testified that the gun . . . was capable of putting out an eye and that it might kill a baby if hit between the eyes. The trial judge in denying defendant's motion to strike the jury's finding that defendant was armed with a 'deadly weapon' under the evidence classified the weapon as a gun; we agree that the evidence was sufficient to justify the jury's finding." (*People v. Sherman, supra*, 251 Cal.App.2d 849, 857.)

The Attorney General relies primarily upon another case involving robberies that were accomplished by the use of a pellet gun: "The People's theory was that the 'gun' found in defendant's car was the one used in both episodes. A police expert testified that that gun was an 'air gun.' The trial court gave to the jury CALJIC No. 9.13.[7] It is contended that giving that instruction, without more, in effect told the jury that the air gun was the kind of weapon envisaged by section 211a of the Penal Code, as that section then read. We see no error. While an air gun is not a 'firearm,' since it uses no explosive to project a bullet, it is still an instrument used to shoot, but one using compressed air rather than explosive for the purpose of projection. As such, it is a 'gun' within the meaning of the instruction given." (*People v. Malone* (1977) 72 Cal.App.3d 649, 655 [138 Cal.Rptr. 397], fn. omitted.)[8]

Despite Lochtefeld's arguments to the contrary, no sound reason appears to define a "deadly weapon" for purposes of section 245 differently than it is defined in other contexts under other statutes. Under the authorities, the determinative question is not the distinction between "firearms" and "pellet guns," but between those guns capable of inflicting great bodily injury, and those that are not.[9]

---

[7]Former CALJIC No. 9.13 read at the time in part: "A dangerous or deadly weapon means any weapon that is capable of being used to inflict great bodily injury or death. [¶] A weapon such as a gun, dirk or blackjack may be said as a matter of law to be a dangerous or deadly weapon. . . ." (See *People v. Malone, supra*, 72 Cal.App.3d at p. 655, fn. 2.)

[8]While Lochtefeld argues that *Malone* is inapplicable because of the "dangerous *or* deadly" language in former CALJIC No. 9.13 (see, *ante*, fn. 7), the *Malone* court's description of the pellet gun as "an instrument designed to shoot" clearly refers to the "deadly" part of the instructional language. (See, e.g., *In re Christopher R., supra*, 6 Cal.4th at p. 94.)

[9]In another situation, involving a tear gas weapon, we cited on the question of operability a case involving a pellet gun: " 'Many cases have interpreted the laws prohibiting possession and use of firearms to apply even if the gun in question is inoperable. [Citations.] [¶] These cases identify what has been called "an important common thread of perceived fear in their discussion of the underlying purpose of The Dangerous Weapons' Control Law [§ 12000 et seq.]." [Citation.] As one case observed, ". . . the statute seeks to deter both physical harm and conduct which produces fear of harm. The fear may arise either from a gun that really shoots or from one which is designed to shoot and gives the appearance of shooting capability. Persons held at gunpoint have no stomach for inquiry. Danger radiates not only from the weapon, but from the defensive reactions of others. In response to the lawbreaker's weapon, operable or not, a victim or law officer may himself resort to a firearm. Further, a

■ In this case, the testimony demonstrated that Lochtefeld's gun in normal operating condition would expel pellets at speeds in excess of those required to penetrate a significant distance into muscle tissue or to enter an eyeball, and thus it was easily capable of inflicting significant injury. The jury in this case was fully entitled to find on the evidence presented that Lochtefeld's pellet gun was a weapon capable of inflicting great bodily injury. Because it was (1) a gun and (2) capable of inflicting great bodily injury, the pellet gun Lochtefeld used was a "deadly weapon" as a matter of law.

### B. *Present Ability to Injure*

A separate question from the status of the gun as a deadly weapon is whether it was operable at the time of the offense. Lochtefeld argues the People failed to demonstrate that at the time he employed the gun, it was sufficiently charged to be an operable deadly weapon. The evidence on this point was however sufficient, because Lochtefeld's own words and actions, in both verbally threatening and in displaying and aiming the gun at others, fully supported the jury's determination the gun was sufficiently operable.

As noted earlier, Lochtefeld threatened to shoot at least one person with his gun, and later aimed his gun directly at two police officers. The case cited in standard of review, *People v. Rodriguez, supra,* 20 Cal.4th 1, involved an assault with a firearm in which the defendant took out a gun and put the barrel under his victim's chin while threatening him. (*Id.* at p. 7.) Confronted with the same claim made herein, our Supreme Court held: "California courts have often held that a defendant's statements and behavior, while making an armed threat against a victim, may warrant a jury's finding the weapon was loaded. For example, in *People* v. *Montgomery* (1911) 15 Cal.App. 315 [114 P. 792], the Court of Appeal, in the absence of direct evidence the gun used in the offense was loaded, and despite the defendant's own testimony it was not, held the jury was entitled, under the circumstances of the case, to reject contrary testimony and find the gun was loaded. [Citation.] The court noted the defendant was enraged when he left a

demand for affirmative proof of operability would allow the defendant to frustrate the statute by getting rid of the gun or concealing it. . . . [I]t is enough that the prosecution produce evidence of a gun designed to shoot and which gives the appearance of shooting capability." [Citation.]' " (*People v. Hamilton* (1998) 61 Cal.App.4th 149, 153 [71 Cal.Rptr.2d 359], quoting *In re Arturo H.* (1996) 42 Cal.App.4th 1694, 1697-1698 [51 Cal.Rptr.2d 5] [dealing with the possession of an inoperable pellet gun possessed in violation of § 626.10, subd. (a)].)

Of course, these observations apply to offenses which do not, as section 245 does, depend upon the operability of the weapon. Given such operability (as we determine), every reason appears to treat the gun herein (particularly when it is a replica of a standard firearm) as the deadly weapon it is.

fight and that he returned with a gun he leveled at the victim, declaring, 'I have got you now.' [Citation.] These words, the court reasoned, would be meaningless unless the weapon were loaded. [Citation.]

"Similarly, in *People v. Mearse* (1949) 93 Cal.App.2d 834, 836-838 [209 P.2d 960], the Court of Appeal, in rejecting a sufficiency of evidence challenge to an assault conviction, concluded the defendant's command to the victim to halt or 'I'll shoot' indicated the gun was then loaded. 'The acts and language used by an accused person while carrying a gun may constitute an admission by conduct that the gun is loaded.' [Citations.]" (*People v. Rodriguez, supra,* 20 Cal.4th at pp. 12-13.)

There is no principled distinction to be drawn between the conduct of the defendants in *Montgomery, Mearse* and *Rodriguez,* and the conduct of Lochtefeld in this case. Again, as the *Rodriguez* court held: "[N]one of the[se] . . . distinctions alters either the basic principle we glean from the cases or its import for this case: A defendant's own words and conduct in the course of an offense may support a rational fact finder's determination that he used a loaded weapon. We cannot say the jury could not reasonably make such a determination here." (*People v. Rodriguez, supra,* 20 Cal.4th at p. 13.)

Here, Lochtefeld's acts in threatening persons on the street and in pointing the gun at officers demonstrated his implied assertion the gun was sufficiently charged to inflict injury. The jury rejected Lochtefeld's trial arguments that his weapon might not have been presently capable of inflicting substantial injury,[10] and no reason appears to disturb that conclusion.

---

[10]The relevant language, of course, comes from section 240: "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury upon the person of another." Despite the fact a gun is, as noted above, both a deadly *and* a dangerous weapon (*In re Christopher R., supra,* 6 Cal.4th at p. 94), California courts have long refused to view an *unloaded* gun as comprising a "present ability" to commit a violent injury, thus necessitating the inquiry we address in this part of the opinion. "A long line of California decisions holds that an assault is not committed by a person's merely pointing an (unloaded) gun in a threatening manner at another person. [Citations.] The continuing viability of this rule is not questioned in this case, and the parties' briefs do not address it." (*People v. Rodriguez, supra,* 20 Cal.4th at p. 11, fn. 3.)

This "operability" requirement is an anachronism which is incompatible with the realities of a society in which the unlawful use of guns is a major and continuing problem, and in light of the fact (*ante,* fn. 9) that both replica guns and real but unloaded or otherwise inoperable guns pose to those threatened with them (such as Lieutenant McGinley herein) an identical sense of dread as does a loaded gun, as well as raising an identical likelihood of a deadly response (McGinley's finger was tightening on the trigger before he realized it was a replica gun pointed at him), we urge our Supreme Court not only to reexamine the continuing viability of this rule, which cannot serve any valid societal function, but to discard it.

DISPOSITION

The judgment is affirmed.

Work, Acting P. J., and Mcintyre, J., concurred.

A petition for a rehearing was denied February 2, 2000, and appellant's petition for review by the Supreme Court was denied April 26, 2000. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.