Filed 12/18/24  P. v. Collins CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062653 |
| v. | (Super. Ct. No. 19CF3209) |
| KAREEM COLLINS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Steven D. Bromberg, Judge. Affirmed.

Alan Siraco, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Adrian Contreras and Daniel Rogers, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Kareem Collins was convicted of pimping and pandering M.C. in violation of Penal Code sections 266h and 266i.[1] On appeal, he contends there is insufficient evidence he derived support from M.C.'s prostitution activities, so as to support his conviction for pimping. He also claims the trial court prejudicially erred in failing to define one of the elements of the pandering charge for the jury. We affirm.

STATEMENT OF FACTS

On November 19, 2019, defendant and M.C. were staying together at the Days Inn motel in Buena Park. At trial, it was undisputed that M.C. was working as a prostitute at that time and that defendant knew she was a prostitute. The main issue for the jury to decide was whether defendant was M.C.'s pimp, as the prosecution alleged, or whether he was simply M.C.'s friend, as the defense maintained.

M.C. testified she was a "renegade" prostitute, meaning she worked without a pimp. But because she did not have a car, defendant would often drive her to her "dates," which were really nothing more than an exchange of sex for money. In return for the rides, M.C. would sometimes give defendant gas money. She also bought him food from time to time and paid for most of their motel bills. However, M.C. testified that she and defendant were just good friends; he did not tell her what to do or control her actions, nor was she required to give him any of the proceeds from her prostitution activity, which amounted to around $700 per week.

M.C. did admit, though, that defendant looked out for her and that they did spend a lot of time together, including on November 19, 2019. That afternoon, an undercover police officer contacted M.C. about an ad for

_____

[1] All further statutory references are to the Penal Code.

sexual services that she had placed online. Following an exchange of text messages, M.C. agreed to have sex with the officer at the Extended Stay America motel in Anaheim for $200.

In anticipation of that meeting, defendant drove M.C. from their motel in Buena Park to the Extended Stay America motel and dropped her off at the front entrance. M.C. then went to the room where the rendezvous was expected to take place and was immediately detained by the police.

M.C. told the police that she had taken an Uber to the motel, but the police knew otherwise. In fact, they had observed defendant drive to a nearby Taco Bell after dropping off M.C. at the motel. While defendant was sitting in his car in front of the restaurant, the police contacted him and placed him under arrest. An officer involved in the operation testified it is common for pimps to hang out in the vicinity after they drop off one of their prostitutes for a date, because it allows them to keep an eye on things from a relatively close distance.

After seizing defendant's phone, the police took him to the station for questioning. While admitting that he and M.C. stayed together often and that he drove her to many of her dates, defendant insisted he was just M.C.'s friend, not her pimp. He said she usually paid for the motels they stayed in, but he chipped in a little money from time to time whenever he was able to do so.

M.C. gave a similar story when the police questioned her back at the Extended Stay America motel. She said she worked as a prostitute on her own volition, in order to support her children. And rather than forcing her to be a prostitute, defendant was actually trying to get her to quit the prostitution business and get another job. Asked about her earnings, M.C. initially told the police that prostitution was her only source of income, but

3

then she said that she also received $300-$600 a month in government assistance.

When the police looked through M.C.'s phone, they found numerous text messages between her and defendant. The prosecution used those messages to refute M.C. and defendant's claim that they were just good friends.

In one of the messages M.C. told defendant that she left $20 on the bed for him. The context of this message was not entirely clear, but the prosecution argued M.C. left the money for defendant after she finished one of her dates in their motel room.

In another series of messages, defendant asked M.C. if she was having a problem with one of men she was on a date with. Defendant wanted to know why M.C. was still with the man and if she needed defendant to "'make him leave.'" M.C. told defendant that the man had given her $100 but that she had not yet finished her date with him.

In another message, defendant asked M.C. if she had made enough money for the room. M.C. replied, "'I only have 80. Didn't even do the date. He just gave me $80.'" She then told defendant that she had another date coming in about 20 minutes.

In other messages, defendant appeared to warn M.C. about the police being in the area. He texted her, "'[i]'s important,'" "'answer,'" "'I think there's a cop in the parking lot.'" He also alluded to "'another UC'"—meaning undercover police officer—being in the area.

In yet another series of messages, M.C. asked defendant if she could use the bathroom on three different occasions over a period of about 16 hours.

The prosecution called Rick Geiss, a police expert on prostitution and sex trafficking, to provide meaning to these messages. He testified the messages signified that defendant had control over M.C.'s daily affairs and that he monitored and was involved in her prostitution activity. More particularly, the messages indicated that defendant acted as a lookout for M.C., provided protection for her, and kept track of how much money she was making on her dates.

Geiss opined the messages were consistent with how a pimp and prostitute typically communicate. A second officer who was involved in the investigation gave a similar opinion on the meaning of the text messages, saying they signaled that M.C. and defendant were working together in a pimping and prostitute relationship.

Testifying further, Geiss said that it is common for prostitutes to refer to their pimps as just a friend, or their boyfriend. And if a prostitute testified against their pimp in court, she would be considered a "rat," which could have negative consequences for her work prospects, as well as her personal safety.

When asked at trial if she was afraid of defendant, M.C. said "not so much." However, she admitted that defendant had beaten up her son one time and that in doing so, defendant may have been trying to send a message to her.

The defense called two witnesses to the stand. The first was a property manager who testified that defendant was making about $3,000 a month as a security guard at the time this case arose, in the fall of 2019. The second defense witness was N.R., a prostitute friend of M.C. who corroborated M.C.'s story that she and defendant we just friends. Although

N.R. admitted that she often saw defendant and M.C. hanging out together, she did not believe he was her pimp.

Nevertheless, the jury found defendant guilty of both pimping and pandering. (§§ 266h, subd. (a), 266i, subd. (a)(1).) The trial court sentenced him to three years in prison for his crimes.

## DISCUSSION

Defendant contends there is insufficient evidence to support his pimping conviction, and the trial court failed to give complete instructions with respect to the pandering charge. For the reasons explained below, we find defendant's arguments unpersuasive.

### I.

#### SUFFICIENCY OF THE EVIDENCE

In order to prove the pimping charge, the prosecution had to establish, inter alia, that defendant knowingly derived support or maintenance in whole or part from the proceeds of M.C.'s prostitution activities. (§ 266h, subd. (a).) Although the jury found that element had been proven beyond a reasonable doubt, defendant argues there is insufficient evidence to support that finding.

*A. Standard of Review*

The standard of review for assessing the sufficiency of the evidence to support a criminal conviction is "highly deferential." (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.) Our task is to "review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

6

In so doing, we do not reweigh the evidence or reevaluate the credibility of the trial witnesses; rather, "[w]e presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.]" (*People v. Lindberg, supra,* 45 Cal.4th at p. 27.) "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [it]."' [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

*B. Analysis*

Defendant admits he knew M.C. was a prostitute and that their relationship had some of the hallmark characteristics of a pimping arrangement. For example, he drove M.C. to her dates, offered her protection from her customers, and acted as her lookout for the police. Nevertheless, defendant maintains there is no evidence that M.C. ever gave him any money from her dates or that he knowingly derived support from her prostitution activities.

However, the record shows that M.C. not only repaid defendant for gas when he drove her to dates, she sometimes left him money and bought him food, and she paid the bulk of their motel bills. During some of their text messages, defendant and M.C. also discussed how much money she was making on her dates, which shows he was interested in what she was bringing in from her prostitution work.

While M.C. insisted that defendant was just looking out for her as a friend, there was also testimony indicating it would be dangerous for her to testify otherwise at defendant's trial. Ultimately, the jury did not find M.C.

to be a believable witness, and we are not at liberty to second guess that credibility determination. (*People v. Rayford* (1994) 9 Cal.4th 1, 23.)

M.C. also told the police that she was getting some government assistance at the time this case arose. In light of this circumstance, defendant argues it would be speculative to conclude the financial assistance he received from M.C. was derived from her prostitution activities. However, the evidence revealed the bulk of M.C.'s income came from working as a prostitute. And as defendant admits, the prosecution was not required to trace the source of the support he received from her to any particular instance of prostitution activity. (See *People v. Jackson* (1954) 128 Cal.App.2d 506, 508-509.) Nor was the prosecution required to prove M.C.'s financial assistance to defendant was his sole source of income. (*Ibid*.) Rather, the prosecution was simply required to prove defendant derived support or maintenance "in whole or in part" from M.C.'s prostitution activities. (§ 266h, subd. (a).)

Viewing the record in favor of the judgment below—as we are required to do—there is substantial evidence to support this requirement. Therefore, we reject defendant's challenge to the sufficiency of the evidence to support his pimping conviction.

II.

THE JURY INSTRUCTIONS ON PANDERING

In order to convict on the pandering charge, the jury had to find, inter alia, that defendant "procured" M.C. to become a prostitute or engage in prostitution activity. Defendant contends the trial court erred in failing to define that term for the jury, but we are not persuaded.

*A. Background*

Defendant was charged with pandering in violation of section 266i, subdivision (a). The purpose of that statute is to "prevent prostitution 'by discouraging persons other than the prostitute from augmenting and expanding a prostitute's operation . . . .'" (*People v. Zambia* (2011) 51 Cal.4th 965, 973.) To that end, section 266i, subdivision (a) describes six types of pandering that are prohibited under the law.[2] The prosecution alleged defendant was guilty of engaging in the first type of pandering listed in the statute, which makes it a felony to "procure[] another person for the purpose of prostitution." (§ 266i, subd. (a)(1).)

Consistent with that theory, the trial court instructed the jury pursuant to CALCRIM No. 1151 that to prove the charge of pandering, the prosecution must prove that defendant "successfully procured" M.C. to be a prostitute.

---

[2] Pursuant to that provision, a person is guilty of pandering if he or she: "(1) Procures another person for the purpose of prostitution. [¶] (2) By promises, threats, violence, or by any device or scheme, causes, induces, persuades, or encourages another person to become a prostitute. [¶] (3) Procures for another person a place as an inmate in a house of prostitution or as an inmate of any place in which prostitution is encouraged or allowed within this state. [¶] (4) By promises, threats, violence, or by any device or scheme, causes, induces, persuades, or encourages an inmate of a house of prostitution, or any other place in which prostitution is encouraged or allowed, to remain therein as an inmate. [¶] (5) By fraud or artifice, or by duress of person or goods, or by abuse of any position of confidence or authority, procures another person for the purpose of prostitution, or to enter any place in which prostitution is encouraged or allowed within this state, or to come into this state or leave this state for the purpose of prostitution. [¶] (6) Receives or gives, or agrees to receive or give, any money or thing of value for procuring, or attempting to procure, another person for the purpose of prostitution, or to come into this state or leave this state for the purpose of prostitution." (§ 266i, subd. (a)(1)-(6).)

During deliberations, the jury sent the trial court a note asking for a "more definitive/clear definition of the word 'procured'" in the pandering instruction. When the court met with the attorneys to discuss the request, defense counsel asked the court to give the jury some synonyms for the word procure, such as "obtain, acquire, get, gain, attain, secure, come by, [or] appropriate."

However, the trial court did not believe that was necessary. Instead, the court referred the jury to CALCRIM No. 200, which states, "Some words or phrases used during this trial have legal meanings that are different from their meanings in everyday use. These words and phrases will be specifically defined in these instructions. . . . Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings."

The issue we must decide is whether the trial court committed reversible error by failing to oblige the jury's request for a definition of the term "procured."

B. *Applicable Legal Principles*

Pursuant to section 1138, supplemental jury instructions may be given when the jury seeks clarification on a point of law. "But '[t]his does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.' [Citation.]" (*People v. Eid* (2010) 187 Cal.App.4th 859, 882.)

In determining whether a trial court's instructions were full and correct, we must remember that although the trial court has the duty to ensure the jurors are "'adequately informed on [the law] to the extent

10

necessary to enable them to perform their function' [citation], it need only 'give explanatory instructions when terms used in an instruction have a technical meaning peculiar to the law [citation].' [Citation.]" (*People v. McCleod* (1997) 55 Cal.App.4th 1205, 1217.) "Commonly understood terms need not be defined for the jury." (*Ibid.*)

*C. Analysis*

The parties dispute whether the term "procured" has a commonly understood meaning, or it required further explanation from the trial court. The case of *People v. Campbell* (2020) 51 Cal.App.5th 463 (*Campbell*) is instructive on that issue.

In *Campbell*, the court rejected a constitutional challenge to section 266i, subdivision (a)(1), which is the provision defendant was convicted of violating in this case. Campbell had argued the statute was unconstitutionally vague because it does not define the term procure. (*Campbell, supra*, 51 Cal.App.5th at p. 492.) However, the court held "[t]he language of the statute is sufficiently clear and settled to provide fair notice of the proscribed conduct." (*Ibid.*) In other words, the average person would know what procure means in the context of the statute. In light of this holding, it stands to reason that the trial court was not required to define the term procured for the jury in this case.

In arguing otherwise, defendant draws our attention to the bench notes accompanying CALCRIM No. 1151, which is the standard instruction on pandering that was given in this case. Those notes state the trial court has the option of using the terms "persuaded" or "arranged" in lieu of the term procured when the defendant is charged with pandering under section 266i, because the term procured "may be difficult for jurors to understand."

11

(Judicial Council of Cal., Crim. Jury Instns. (2019) Bench Notes to CALCRIM No. 1151, p. 903.)

Although the note is phrased as a suggestion, and not a requirement, defendant contends the trial court should have heeded it in light of the jurors' note and instructed them that procured means "arranged." Defendant prefers that term over the term "persuaded" because, like the synonyms offered by his attorney at trial, the term "arranged" implies that the defendant must do more than merely try to persuade a person to be a prostitute; rather, the defendant must actually prevail in terms of accomplishing that objective.

Our response is twofold. First, the bench notes' suggestion about using the term "arranged" is directed at cases where the defendant is accused of violating section 266i by procuring a person to be a prostitute in a house of prostitution in violation of subdivision (a)(3) of the statute. As explained above, defendant was not charged under that subdivision in this case.

Second, it is clear the court's instructions were worded so as to require proof that defendant actually achieved his goal of getting M.C. to engage in prostitution activity. In that regard, it is significant that the instructions did not simply require the prosecution to establish that defendant "procured" M.C. to be a prostitute. Rather, they required proof that he "*successfully* procured" M.C. to be a prostitute. (Italics added.) This ensured the jury could not convict defendant of pandering if he merely attempted to induce or encourage M.C. to be a prostitute without actually succeeding in that respect. Because the trial court's instructions on pandering accurately described the elements of that offense, they are not cause for reversal.

## DISPOSITION

The judgment is affirmed.


DELANEY, J.

WE CONCUR:


O'LEARY, P. J.


GOETHALS, J.

13