Filed 4/10/25  P. v. Parker CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. DAVID DUANE PARKER, Defendant and Appellant. | F088301 (Super. Ct. No. SUF23393B) OPINION |

-ooOoo-

## THE COURT*

APPEAL from a judgment of the Superior Court of Merced County.  Mark V. Bacciarini, Judge.

James Bisnow, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Christopher J. Rench and Kelly E. LeBel, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*       Before Peña, Acting P. J., Meehan, J. and Snauffer, J.

Defendant David Duane Parker appeals from the trial court's denial of his Penal Code[1] section 1172.6 petition seeking resentencing for a 2000 conviction for first degree murder, with special circumstances. Defendant specifically challenges the court's conclusion defendant was a major participant in the murder and exhibited a reckless indifference to human life. Following our review of the record and the relevant legal authorities, we affirm.

## PROCEDURAL SUMMARY

In 1999, an information was filed in the Merced County Superior Court charging defendant with first degree murder (§ 187, subd. (a); count 1), kidnapping for the purpose of committing a robbery (§ 209, subd. (b); count 2), carjacking (§ 215, subd. (a); count 3), and robbery (§ 211; count 4). The information contained special circumstance allegations connected to the first degree murder count alleging the murder occurred while committing or attempting to commit carjacking, kidnapping, and robbery, supporting a conviction for felony murder (§ 190.2, subd. (a)(17)(A), (B), & (L)). An additional special circumstance allegation alleged defendant committed the murder while lying in wait (§ 190.2, subd. (a)(15)). In March 2000, a jury found defendant guilty of committing all four counts, and further found true the carjacking, kidnapping and robbery felony-murder special circumstance allegations.

Defendant was eventually sentenced to life without the possibility of parole for the special circumstance first degree murder count, while sentences on the remaining counts were imposed but stayed pursuant to section 654. An appeal of this conviction resulted in this court amending the sentences for the stayed counts, but otherwise affirming the judgment. (See *People v. Parker I* (Feb. 21, 2002, F035834) [nonpub. opn.].)

A petition for writ of habeas corpus was filed by defendant in 2020 citing legislative changes to the definition of felony murder asking to be resentenced on the

---

**1** All further statutory references are to the Penal Code.

first degree murder conviction.  The petition was denied in both the trial court and later this court.  (See *In re Parker* (May 21, 2020, F081035) [nonpub. order].)

On April 4, 2022, defendant filed yet another petition in the trial court again requesting resentencing on the first degree murder conviction.  The trial court denied the petition without a hearing, declaring the special circumstance findings made defendant ineligible for the requested relief.  Consistent with the Supreme Court decision in *People v. Strong* (2022) 13 Cal.5th 698 (*Strong*), this court reversed that order, stating the special circumstance findings were made before the Supreme Court opinions in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) "and therefore, are not dispositive on a prima facie review of the petition under section 1172.6."  (*People v. Parker II* (Aug. 2, 2023, F085006) [nonpub. opn.].)

The matter was remanded, and a new hearing was set to consider resentencing.  The prosecution submitted its opposition, arguing defendant was not eligible for resentencing.  Following a hearing, the trial court again denied defendant's section 1172.6 petition concluding he was guilty of first degree murder because he was a "major participant" in the crime and acted with "reckless indifference to human life."  These findings by the trial court are the basis for this appeal.

## FACTUAL SUMMARY

The evidence submitted at the hearing on the section 1172.6 hearing consisted primarily of the transcript from the original trial held in 2000.  No other testimony was offered.  At this trial, defendant was one of two defendants being tried in the same proceeding.  Because this appeal is brought only by defendant, we will attempt to focus, as much as possible, on the facts illustrating defendant's participation in this crime.

On the morning of December 5, 1997, a motorist observed a body on the side of a rural road near Highway 99.  The motorist immediately dialed 911 to report what he had observed.  A California Highway Patrol (CHP) officer responded to the call and

3.

confirmed there was a partially burned body on the side of the road. The CHP officer then protected the scene while he waited for the sheriff's department to arrive.

A pathologist testified he was asked to respond to the scene to help determine the cause of death. The pathologist stated his belief the time of death had occurred within the prior 12 hours. A more detailed autopsy was conducted on December 8, 1997. After detailing the significant blunt force trauma inflicted to the head and upper portion of the victim's body, as well as the burns inflicted mostly to the lower half of the body, the pathologist concluded any burning occurred at or right after the time of death. After providing a more detailed description of the various injuries inflicted, the pathologist concluded the cause of death was "blunt force injury to the right side of the head and the brain," and further, that the burning of the body was not a contributing factor to the death.

CHP Officer Larry Chambers testified that around 9:00 p.m. on December 4, 1997, he stopped a car that was speeding on southbound Highway 99. Chambers observed two men in the front seat of the car, and three women in the back seat. Chambers eventually determined that the driver was unlicensed and that while the car was a rental, the person who had apparently rented the car was not present. Because of this, Chambers decided to impound the car and escort the occupants of that car off the freeway. The ticket issued for this incident by Chambers was signed by defendant using his own name. The occupants were then dropped off, along with their luggage, outside a nearby restaurant.

Among the occupants in the car when it was pulled over by Chambers were three young women, N.W., M.J., and J.G, who were all minors at that time. In her testimony, N.W. identified both defendant and his codefendant Jameel Coles as the two males the minors were traveling with. N.W. testified that when they were dropped off at the nearby restaurant, there was a discussion about needing a car. N.W. stated the five were eventually able to get a ride from a man they met at this location who had a tan

4.

colored van. The man they met was Nathaniel Thompson, who would eventually become the victim in this case.

While they were driving, N.W. recalled hearing defendant and Coles whispering that "they had to get the car." Soon thereafter, Thompson pulled off the freeway and stopped in a parking lot. Thompson got out of the van, along with defendant and Coles, and opened the side door to the van to start removing their luggage. N.W. testified that at this point, Thompson was hit and landed halfway into the van through that side door. While not identifying who hit Thompson, N.W. recalled defendant was the closest to Thompson when this happened and that she heard defendant say, " 'I busted my fist.' " N.W. also recalled seeing blood on defendant's hand. M.J., one of the other young women who had been in the van that night, later confirmed in her testimony that defendant was closest to Thompson when he was hit. After defendant and Coles moved Thompson further into the van, Coles got on top of him to restrain him while defendant got into the driver's seat and returned to the highway. While being held down by Coles, Thompson woke up and pleaded to be let go.

At some point, defendant drove the van away from the freeway and stopped on a rural road. Defendant then got out of the van and walked around to open the side door. M.J. testified Thompson was taken out of the van "by force."

J.G., the third young woman in the van, provided testimony that both defendant and Coles started to beat Thompson when he was taken out of the van. J.G. specifically stated that defendant and Coles were "kicking him," while Thompson was on the ground. After observing Coles take a pillow from the van and smothering Thompson with that pillow, J.G. stated Coles then retrieved a ladder from the van.[2] Seconds later, J.G. witnessed Thompson's body on fire. J.G. confirmed defendant was still outside the van

---

[2]    Other testimony provided by Coles accused M.J. and J.G. of putting the pillow over Thompson's head to suffocate him.

when the fire started. J.G. later testified during cross-examination that when she asked defendant why this had occurred, defendant told J.G. "it wasn't supposed to happen this way," and Thompson was not supposed to die.

*Defense*

Defendant did not testify in his own defense. However, Coles did testify.

Coles admitted in his testimony that he and defendant planned to drive N.W., M.J., and J.G. to Las Vegas to put them to work as prostitutes. Coles admitted he and defendant also discussed stealing a car, but not carjacking one. Coles testified he was surprised when defendant hit Thompson in the head after Thompson had stopped to let them out in the parking lot. Coles acknowledged pulling Thompson into the van after he was hit by defendant, and also admitted holding Thompson down when defendant took over as the driver.

After traveling a short distance, defendant stopped the van on a rural road. Coles testified Thompson "f[ell] out" of the van and bear crawled on the ground. While Coles admitted kicking Thompson in his chest after Thompson kicked him, he denied kicking Thompson in the head. Coles instead implied that J.G. and M.J. got out of the van and kicked Thompson in a manner that caused his death. Coles also described how M.J. and J.G. put the pillow over Thompson's head to suffocate him.

While he believed defendant was outside the van, Coles could not remember exactly where defendant was when each of these acts unfolded.

## DISCUSSION

Defendant's main contention is that substantial evidence does not support the trial court's ruling, and that as a result, he should have been eligible for resentencing under section 1172.6.

I.      **Is Defendant Eligible For Resentencing Under Section 1172.6?**

A.      **Applicable Law**

Section 1172.6, subdivision (a) provides:

6.

"A person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter may file a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts .…"

Resentencing is not automatic, requiring a hearing to determine whether the defendant meets the criteria for resentencing. (§ 1172.6, subd. (d).)

We review a trial court's denial of a section 1172.6 petition after the evidentiary hearing for substantial evidence. (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) "Under [the substantial evidence] standard, we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*Ibid*.) The standard of review is "highly deferential." (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.) " 'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.)

When death occurs during the commission of a robbery or attempted robbery, first degree murder liability extends to any "major participant" in the offense who acted with "reckless indifference to human life." (§ 189, subd. (e)(3).) The elements of major participation and reckless indifference to human life were incorporated into the statute defining murder by legislative decree in 2019. (See Stats. 2018, ch. 1015, § 3; see § 189, subd. (e)(3).) In doing so, the Legislature codified the Supreme Court's interpretations of these concepts which were expressed in two separate cases. (*Strong*, *supra*, 13 Cal.5th at p. 710.)

In *Banks*, *supra*, 61 Cal.4th 788, the Supreme Court addressed factors considered relevant to deciding when "an accomplice who lacks the intent to kill may qualify as a

major participant." (*Id*. at p. 794.)  The *Banks* factors include:  "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?"  (*Id*. at p. 803, fn. omitted.)

The Supreme Court in *Clark*, *supra*, 63 Cal.4th 522, soon thereafter addressed the factors relevant to determining whether a defendant acted with reckless indifference to human life.  (*Id*. at pp. 618–623.)  The *Clark* factors have been summarized to include:  "Did the defendant use or know that a gun would be used during the felony?  How many weapons were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?"  (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*), citing *Clark*, at pp. 618–623.)

Courts are encouraged not to focus on any single *Banks* or *Clark* factor as determinative—or even necessary.  (*Banks*, *supra*, 61 Cal.4th at p. 803; *Clark*, *supra*, 63 Cal.4th at pp. 618, 621–623.)  Instead, courts are to assess the totality of a defendant's culpability within a "spectrum" of culpability expressed by the United States Supreme Court in *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*) and *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*).  (See *Strong*, *supra*, 13 Cal.5th at p. 705.)

The *Banks* court offered the following summary of the *Enmund* case which was the earlier of the two cases before the United States Supreme Court:

"[D]efendant Earl Enmund purchased a calf from victim Thomas Kersey and in the process learned Kersey was in the habit of carrying large sums of cash on his person.  A few weeks later, Enmund drove two armed confederates to Kersey's house and waited nearby while they entered.  When Kersey's wife appeared with a gun, the confederates shot and killed both Kerseys.  Enmund thereafter drove his confederates away from the scene and helped dispose of the murder weapons, which were never found.  He was convicted of robbery and first degree murder ….

"On these facts, the United States Supreme Court reversed Enmund's death sentence as prohibited by the federal Constitution.  The court found a broad consensus against imposing death in cases 'where the defendant did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder.' (*Enmund …*, *supra*, 458 U.S. at p. 795.)  Accordingly, it held the Eighth Amendment bars the death penalty for any felony-murder aider and abettor 'who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.' (*Enmund*, at p. 797.)  The intent to commit an armed robbery is insufficient; absent the further 'intention of participating in or facilitating a murder' (*id*. at p. 798), a defendant who acts as 'the person in the car by the side of the road at the time of the killings, waiting to help the robbers escape' (*id*. at p. 788) cannot constitutionally be sentenced to death." (*Banks*, *supra*, 61 Cal.4th at p. 799.)

The *Banks* court then provided a summary of the *Tison* case, which applied the test expressed in *Enmund*:

"In *Tison …*, *supra*, 481 U.S. 137, the Supreme Court revisited the issue of [special circumstance] sentences for those guilty of felony murder as accomplices.  Prisoner Gary Tison's sons Ricky, Raymond, and Donald Tison conducted an armed breakout of Gary and his cellmate from prison, holding guards and visitors at gunpoint.  During the subsequent escape, their car, already down to its spare tire, suffered another flat, so the five men agreed to flag down a passing motorist in order to steal a replacement car.  Raymond waved down a family of four; the others then emerged from hiding and captured the family at gunpoint.  Raymond and Donald drove the family into the desert in the Tisons' original car with the others following.  Ricky and the cellmate removed the family's possessions from their car and transferred the Tison gang's possessions to it; Gary and his cellmate then killed all four family members….  Ricky and Raymond Tison and the cellmate were tried and sentenced to death.  The trial court made findings that Ricky and Raymond's role in the series of crimes was

9.

' "very substantial" ' and they could have foreseen their actions would ' "create a grave risk of … death." ' (*Id*. at p. 142.)"

"The United States Supreme Court granted Ricky's and Raymond's petitions to consider the application of *Enmund* to these facts.… Specifically, *Tison* described the range of felony-murder participants as a spectrum. At one extreme were people like 'Enmund himself: the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state.' ([*Tison*, *supra*, 481 U.S.] at p. 149.) At the other extreme were actual killers and those who attempted or intended to kill. (*Id*. at p. 150.) Under *Enmund*, *Tison* held, death was disproportional and impermissible for those at the former pole, but permissible for those at the latter. (*Ibid*.) The Supreme Court then addressed the gray area in between, the proportionality of capital punishment for felony-murder participants who, like the two surviving Tison brothers, fell 'into neither of these neat categories.' (*Ibid*.) Here, the court announced, 'major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement.' (*Id*. at p. 158.)" (*Banks*, *supra*, 61 Cal.4th at pp. 799–800.)

The *Tison* court ultimately vacated the death penalty imposed on the two brothers and remanded the matter for further proceedings, noting the trial court had used an improper standard. (*Tison*, *supra*, 481 U.S. at p. 158.) The *Banks* court noted that it was the language requiring " 'major participation' " and a " 'reckless indifference to human life,' " from the *Tison* opinion that was later codified by the electorate into section 190.2, subdivision (d). (*Banks*, *supra*, 61 Cal.4th at p. 800.)

### B. Application

In the absence of evidence to the contrary, we presume the trial court knew and applied the correct standards as expressed in relevant statutes and case law. (*People v. Thomas* (2011) 52 Cal.4th 336, 361.)

### 1. Was defendant a "major participant?"

Again, we turn to the *Banks* opinion which addressed factors considered relevant to deciding when "an accomplice who lacks the intent to kill may qualify as a major participant." (*Banks*, *supra*, 61 Cal.4th at p. 794.) Two factors are especially applicable

here, asking whether the defendant was present at the scene of the killing, or in a position to facilitate or prevent the actual murder. This factor further asks whether the defendant's actions or inaction played a role in the death. (*Id*. at p. 803.) Defendant was clearly present at the scene when Thompson was killed. Evidence in the record describes how defendant struck Thompson, which resulted in his falling into the van. Defendant then took over the driving duties and turned off the highway to a rural road where Thompson was taken out of the van, while pleading for his life, and beaten to death. While each of the other four occupants of the van testified defendant was outside the van the entire time Thompson was being beaten, suffocated, then burned, only one witness testified defendant participated in beating Thompson. There is also nothing in the record indicating defendant took any action to minimize the possibility of violence.

Yet another *Banks* factor asks what defendant did after lethal force was used. (*Bank*, *supra*, 61 Cal.4th at p. 803.) The evidence is consistent that after Thompson's body was left to burn, defendant returned to the driver's seat and continued on the trip to Las Vegas. There was no evidence in the record showing defendant provided any assistance to Thompson.

### 2. Did defendant display a "reckless indifference to human life?"

The *Clark* factors are also important to this determination. Of these factors we can easily conclude the evidence shows defendant was present at the scene of the crime and had a reasonable opportunity to restrain the crime or aid the victim. Furthermore, based on the testimony provided by the various occupants of the van, defendant neither said nor did anything to restrain Coles or anyone else from engaging in the acts that lead to Thompson's death, thereby failing "to minimize the risks of violence during the felony[.]" (*Scoggins*, *supra*, 9 Cal.5th at p. 677.) In fact, at least one witness testified that defendant engaged in kicking Thompson once he was pulled out of the van.

The evidence also shows these events did not occur spontaneously, even if defendant told J.G. "it wasn't supposed to happen this way." The evidence supplies

11.

substantial evidence that the events unfolded over a period or "duration" of time. (*Scoggins*, *supra*, 9 Cal.5th at p. 677.)  First, Thompson offered the entire entourage a ride and drove them toward their ultimate destination.[3]  Thompson was then knocked out by defendant at this second location and held down in the van while defendant drove to a third location.  At the third location, Thompson was pulled out of the van and beaten in such a way that caused his death.  Evidence in the record provides substantial evidence that defendant participated in the beating, or at the very least, stood by while others engaged in the beating.  At its core, "[r]eckless indifference to human life is 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Id*. at p. 676, quoting *Tison*, *supra*, 481 U.S. at p. 157.)  As the events unfolded here, "a grave risk of death" increased at each stage.

### 3. Where does this case fall on the spectrum between *Enmund* and *Tison*?

Unlike the facts in *Enmund*, defendant was present when the "killing took place" and, according to one witness, participated in the beating that led to Thompson's death. (*Enmund*, *supra*, 458 U.S. at p. 795.)  There was also evidence that defendant participated in the plot to take the van from Thompson, which he helped accomplish by knocking Thompson out at the second location to prevent him from leaving with the van. Thompson then drove the van to a third location on a rural road where Thompson was taken out of the van and beaten, then burned.  Even if we conclude, which we do not, that evidence does not support the conclusion defendant participated in the beating, we cannot ignore that defendant was close to these events, participated in moving the events along, then did nothing to stop the progression of the events that lead to Thompson's death.

---

[3]  While there was some testimony the group represented they wanted to go to a nearby bus station, there is no evidence in the record about how far away that bus station was from the location where they met Thompson.

Instead, this case comes much closer to the facts presented in *Tison*. Defendant and Coles expressed an intent to get a new car after theirs was impounded. When Thompson offered the group a ride, defendant and Coles were overheard discussing how they had to "get" the van. When the group stopped at the second location, defendant struck Thompson hard enough to cause him to lose consciousness and then to be transported to the final location where he was killed by the whole group while defendant mostly watched.

The requirements of being a major participant and having reckless indifference to human life overlap, " 'for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' " (*Clark*, *supra*, 63 Cal.4th at p. 615.) The trial court here found "beyond a reasonable doubt that [defendant] was a major participant in the crime," and that "[t]he whole crime was horrific, and certainly reckless and indifferent to human life." (See *People v. Cody* (2023) 92 Cal.App.5th 87, 113.)

Our review of the record confirms that substantial evidence, of " ' " 'reasonable, credible, and of solid value,' " ' " supports the trial court's findings that defendant was a major participant and acted with reckless indifference to human life. (*People v. Reyes*, *supra*, 14 Cal.5th at p. 988.) As a result, the denial of defendant's section 1172.6 petition was not made in error.

## **DISPOSITION**

The judgment is affirmed.